UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MIDWEST ATHLETICS AND SPORTS
ALLIANCE LLC,

                    Plaintiff,

          v.

XEROX CORP.,

                    Defendant.

_____

**DECISION AND ORDER**

6:19-CV-06036 EAW

## INTRODUCTION

Plaintiff Midwest Athletics and Sports Alliance LLC ("Plaintiff" or "MASA") asserts claims of patent infringement against Defendant Xerox Corp. ("Defendant" or "Xerox"). (Dkt. 1). Plaintiff's original complaint asserted claims from 20 patents related to printer technology. (*Id.*). Consistent with a case management protocol adopted by the Court (*see* Dkt. 118; Dkt. 204), Plaintiff has been required to proceed with no more than eight patents and 16 claims. Those remaining patents are: United States Patent Numbers 6,203,005 (the "'3005 Patent"); 6,411,314 (the "'314 Patent"); 6,509,974 (the "'974 Patent"); 6,718,285 (the "'285 Patent"); 6,799,005 (the "'9005 Patent"); 8,019,255 (the "'255 Patent"); 7,502,582 (the "'582 Patent"); and 8,005,415 (the "'415 Patent") (collectively the "Elected Patents"). (Dkt. 252-2). Plaintiff has asserted the following 12 claims from the Elected Patents: claim 1 of the '3005 Patent; claims 1 and 51 of the '314

Patent; claims 1 and 2 of the '974 Patent; claims 1 and 14 of the '285 Patent; claim 1 of the '9005 Patent; claim 12 of the '255 Patent; claims 1 and 5 of the '582 Patent; and claim 1 of the '415 Patent.  (*Id*.; *see also* Dkt. 242-3 at ¶ 6; Dkt. 258-1 at ¶ 6).

Six motions are currently pending before the Court: (1) Defendant's motion to strike and exclude portions of Plaintiff's expert reports (Dkt. 237 ("Defendant's Motion to Strike")); (2) Plaintiff's motion to strike and exclude portions of Defendant's expert reports (Dkt. 238 ("Plaintiff's Motion to Strike")); (3) Plaintiff's motion for summary judgment of validity (Dkt. 242 ("Plaintiff's Validity Motion")); (4) Defendant's motion for summary judgment of invalidity and unenforceability (Dkt. 243 ("Defendant's Invalidity Motion")); (5) Plaintiff's motion for summary judgment of infringement (Dkt. 246 ("Plaintiff's Infringement Motion")); and (6) Defendant's motion for summary judgment of non-infringement (Dkt. 247 ("Defendant's Non-Infringement Motion")).[1]  The Court resolves these motions as set forth in detail below, and ultimately concludes that: (1) Defendant is entitled to summary judgment of invalidity as to claims 1 and 14 of the '285 Patent, claim 1 of the '9005 Patent, and claim 12 of the '255 Patent; and (2) Defendant is entitled to summary judgment of non-infringement as to claim 1 of the '3005 Patent, claims 1 and 51

---

[1]     Numerous motions to seal were filed in connection with these motions.  The Court denied the original ten motions to seal without prejudice for lack of proper support and failure to narrowly tailor the sealing requests.  (*See* Dkt. 270).  The parties filed renewed motions to seal on July 15, 2022.  (Dkt. 271; Dkt. 272).  The Court granted the renewed motions to seal on September 12, 2022.  (Dkt. 277).

of the '314 Patent, claims 1 and 2 of the '974 Patent, claims 1 and 5 of the '582 Patent, and claim 1 of the '415 Patent.

## PROCEDURAL BACKGROUND

Plaintiff commenced this action on December 13, 2017, in the United States District Court for the District of Nebraska.  (Dkt. 1).  The matter was transferred to this District on January 11, 2019.  (Dkt. 76).  The undersigned referred the matter to Magistrate Judge Jonathan W. Feldman for supervision of all pretrial matters excluding dispositive motions on January 28, 2019.  (Dkt. 79).[2]  Judge Feldman thereafter appointed Susan E. Farley, Esq. (the "Special Master") as a special master.  (Dkt. 102; Dkt. 106; Dkt. 108).

On November 4, 2019, Judge Feldman entered an Order adopting the Special Master's recommendation, agreed to by the parties, that following the close of discovery, Plaintiff would elect to proceed with no more than 16 claims.  (Dkt. 118 at 4).  The Special Master further recommended that, following the close of discovery, Plaintiff be required to elect to proceed with no more than eight patents.  (Dkt. 149).  Plaintiff objected to this proposal (Dkt. 157), but the Court overruled Plaintiff's objections and adopted the Special Master's recommendation (Dkt. 204).[3]

---

[2]    Following Judge Feldman's retirement, the matter was referred to Magistrate Judge Mark W. Pedersen.  (Dkt. 119).  Judge Pedersen subsequently recused himself, and the matter was referred to Magistrate Judge Marian W. Payson, who continues to supervise non-dispositive matters.  (Dkt. 147; Dkt. 148).

[3]    Plaintiff filed a petition for a writ of mandamus challenging the Court's decision with the Court of Appeals for the Federal Circuit. *See* Petition, *In re: Midwest Athletics*

Discovery in this matter closed on October 15, 2021.  (Dkt. 227).  Defendant's Motion to Strike and Plaintiff's Motion to Strike were filed on November 30, 2021.  (Dkt. 237; Dkt. 238).  Plaintiff's Validity Motion and Defendant's Invalidity Motion were filed on December 15, 2021.  (Dkt. 242; Dkt. 243).  Plaintiff's Infringement Motion and Defendant's Non-Infringement Motion were filed on December 30, 2021.  (Dkt. 246; Dkt. 247).  Responses to the pending motions were filed on January 31, 2022.  (Dkt. 252; Dkt. 253; Dkt. 254; Dkt. 255; Dkt. 257; Dkt. 258).  Replies were filed on February 22, 2022. (Dkt. 261; Dkt. 262; Dkt. 263; Dkt. 264; Dkt. 266; Dkt. 267).  The Court heard oral argument on the pending motions on August 17, 2022, and reserved decision.  (Dkt. 274).

## DISCUSSION

As set forth above, the pending motions have essentially been filed in pairs.  For ease of understanding and efficiency, the Court will first consider the parties' motions to strike, then the parties' motions regarding validity/invalidity, and finally the parties' motions regarding infringement/non-infringement.

## I.  The Motions to Strike

### A.  Legal Standard

Pursuant to Federal Rule of Evidence 702, a proposed expert witness must possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  In

---

*and Sports Alliance LLC*, No. 21-167, Dkt. 2 (Fed. Cir. Aug, 3, 2021).  The Federal Circuit denied Plaintiff's petition on September 10, 2021.

accordance with this rule, a court considering the admissibility of expert testimony must consider whether (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b), (c), (d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must make sure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify."  *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).   "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria."  *Id.*  (quotation and alteration omitted).  "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'"

*M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

      **B.**      **Defendant's Motion to Strike**

Defendant's Motion to Strike asks the Court to: (1) strike from Plaintiff's expert reports all references to infringement theories that Plaintiff did not properly disclose pursuant to this District's Local Patent Rules ; and (2) exclude "irrelevant and unreliable" testimony by Plaintiff's damages expert David Drews ("Drews"). (Dkt. 237-1). The Court considers each of these requests below.

      **1.**      **Undisclosed Infringement Theories**

To properly assess the merits of Defendant's first argument, a brief summary of certain provisions of this District's Local Patent Rules is required. Specifically, Local Patent Rules 3.1 and 3.7 together require any party claiming patent infringement to serve "final infringement contentions" setting forth in detail, among other things: (1) each claim of each patent in suit that is allegedly infringed by the opposing party, including identifying the applicable statutory subsections of 35 U.S.C. § 271 asserted as to each claim; (2) for each asserted claim, every accused instrumentality of the opposing party of which the party claiming infringement is aware; and (3) a chart specifying where each limitation of each asserted claim is found within each accused instrumentality. Local Patent Rule 3.10 allows for amendment of final infringement contentions "only by order of the Court upon a

showing of good cause and absence of unfair prejudice to opposing parties, made promptly upon discovery of the basis for the amendment."

In this case, Plaintiff served its Final Infringement Contentions on August 14, 2019. (Dkt. 213 at 3). After Defendant objected to certain aspects of the original Final Infringement Contentions, Plaintiff served amended Final Infringement Contentions as to three of the patents in suit on October 25, 2019. (*Id*. at 3 n.3).

Over one year later, on February 23, 2021, Plaintiff sought leave to amend its complaint and supplement its Final Infringement Contentions. (Dkt. 190). Plaintiff sought to: (1) add infringement allegations for four products released after it filed its complaint; (2) add additional infringement allegations related to previously accused products, "including specifically naming those products in its infringement contentions and mapping them to particular patents and alleging that certain of those products infringe other previously asserted patents"; and (3) add four counts alleging that the '314 Patent, the '974 Patent, the '9005 Patent, and United States Patent No. 6,462,756 (the "'756 Patent")[4] are indirectly infringed. (Dkt. 213 at 5).[5] On July 9, 2021, Judge Payson entered a Decision and Order permitting Plaintiff to amend its complaint and infringement contentions to add proposed allegations related to two new products, but otherwise denying leave to make

---

[4]    Plaintiff has not elected any claims in the '756 Patent at this stage of the proceedings.

[5]    Plaintiff also sought to make certain additional changes that are not relevant here and that were not opposed by Defendant. (Dkt. 213 at 5 n.5).

these amendments.  (*Id*. at 26).  Plaintiff did not ultimately serve an amended complaint or amended infringement contentions to make the changes permitted by Judge Payson.  (Dkt. 237-2 at ¶ 17).

The parties served opening expert reports in this case on June 2, 2021.  (*Id.* at ¶ 7). On June 7, 2021, Defendant sent a letter to Judge Payson in which it asserted that the expert reports at issue contained "significant new additions to MASA's infringement theories that were not disclosed in MASA's Final Infringement Contentions served August 14, 2019 and October 25, 2019" and asked Judge Payson to set an expedited schedule to hear an anticipated motion to strike.  (Dkt. 237-10 at 2-3).  However, the parties ultimately agreed to a schedule whereby Defendant's motion to strike would be filed after the close of discovery.  (Dkt. 237-11 at 2).

Defendant has submitted to the Court in connection with Defendant's Motion to Strike a nine-page "summary table" in which it identifies more than 40 instances of "new matter" in Plaintiff's expert reports.  (Dkt. 237-9).  Defendant asks the Court to strike these instances of "new matter" for failure to comply with the Local Patent Rules.  In opposition, Plaintiff contends that it "properly disclosed in its Final Infringement Contentions each of the portions of MASA's infringement expert reports that Xerox raises in its Motion."  (Dkt. 253 at 7).

The Federal Circuit "review[s] the validity and interpretation of . . . patent local rules under Federal Circuit law, applying an abuse of discretion standard."  *Phigenix, Inc.*

*v. Genentech, Inc.*, 783 F. App'x 1014, 1016 (Fed. Cir. 2019) (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364, 1366-67 (Fed. Cir. 2006)).   As the Federal Circuit explained in *Phigenix*:

> Because patent local rules "are essentially a series of case management orders," a district court "may impose any 'just' sanction for the failure to obey" them, including "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence."

*Id*. (quoting *O2 Micro*, 467 F.3d at 1363).   "Decisions enforcing local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence."   *O2 Micro*, 467 F.3d at 1366-67; *see also SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) ("[T]his court gives broad deference to the trial court's application of local procedural rules in view of the trial court's need to control the parties and flow of litigation before it.").

It is common for district courts to adopt local patent rules—like Local Patent Rules 3.1 and 3.7—requiring service of infringement contentions.   "The purpose of infringement contentions is to provide notice of a plaintiff's specific theories of infringement," which in turn "streamlines discovery and narrows the issues for trial."   *CommScope Techs. LLC v. Dali Wireless, Inc.*, No. 3:16-CV-0477-M, 2018 WL 4566130, at *1 (N.D. Tex. Sept. 21, 2018).   "Given the purpose of these disclosure requirements, expert reports cannot go beyond the bounds of the disclosed infringement theories and introduce new theories not

disclosed in the contentions." *KlausTech, Inc. v. Google LLC*, No. 10-CV-05899 JSW DMR, 2018 WL 5109383, at *3 (N.D. Cal. Sept. 14, 2018), *aff'd*, 792 F. App'x 954 (Fed. Cir. 2020). The Federal Circuit has affirmed the striking of expert reports where they contain infringement theories that were not previously disclosed in compliance with local procedural rules. *See Phigenix*, 783 F. App'x at 1017-18; *BookIT Oy v. Bank of Am. Corp.*, 817 F. App'x 990, 995 (Fed. Cir. 2020); *see also Corus Realty Holdings, Inc. v. Zillow Grp., Inc.*, No. C18-0847JLR, 2020 WL 488545, at *6 (W.D. Wash. Jan. 30, 2020) ("An expert report may not advance a new or alternate theory of infringement that was not disclosed in the party's contentions."), *aff'd*, 860 F. App'x 728 (Fed. Cir. 2021).

With these principles in mind, the Court turns to the specific infringement theories to which Defendant objects. Defendant has organized its chart by patent, and so the Court will conduct its analysis in a similar fashion.

### a.   <u>The '582 Patent</u>

The '582 Patent issued on March 10, 2009, and is entitled "Method and Apparatus for Printing Using a Tandem Electrostatographic Printer." (Dkt. 247-34 at 2). It relates "to methods and systems for printing using five or more color pigments, and applying a clear toner overcoat in addition to the five or more color pigments." (Dkt. 185 at 8 (citation omitted)). As noted above, Plaintiff claims infringement of claims 1 and 5 of the '582 Patent, which provide as follows:

> [Claim 1:] A method of printing to form colored images with improved color gamut and enhanced gloss, the method comprising: forming a color print

using five or more different color pigments which in combination form at least a pentachrome color image; depositing a clear toner overcoat to the at least pentachrome color image, wherein the clear toner overcoat is formed as a receiver and image dependent inverse mask; and subjecting the clear toner overcoat and the at least pentachrome color image to a gloss enhancing process.

[Claim 5:] A method of printing to form colored images with improved color gamut and enhanced gloss, the method comprising: forming a color print using five or more different color pigments which in combination form at least a pentachrome color image, wherein the at least pentachrome color image is formed in a single pass through a printer apparatus; depositing a clear toner overcoat to the at least pentachrome color image, wherein the clear toner overcoat is formed as a receiver and image dependent inverse mask; and subjecting the clear toner overcoat and the at least pentachrome color image to a uniform gloss enhancing process.

(Dkt. 247-34 at 18).

Defendant identifies five issues with Plaintiff's expert reports as to the '582 Patent. First, Defendant argues that the supplemental report of Bruce Kahn, Ph.D. dated July 13, 2021 (the "Kahn Supplemental Report") (Dkt. 280-1) improperly newly alleges that a "clear overcoat" and "fusing" are gloss enhancing processes, and that these theories were not disclosed in Plaintiff's Final Infringement Contentions. (Dkt. 237-9 at 2). Plaintiff responds that its Final Infringement Contentions allege that applying additional clear overcoat is a gloss enhancing process. (Dkt. 253-2 at 2).

The Court agrees with Defendant that Plaintiff's Final Infringement Contentions do not disclose a theory that either a clear overcoat or fusing are gloss enhancing processes. Pursuant to the Local Patent Rules, Plaintiff was required to set forth in its Final Infringement Contentions "specifically where each limitation of each asserted claim is

found within each Accused Instrumentality[.]" L. Pat. R. 3.1(c), 3.7. Here, Plaintiff's Final Infringement Contentions indicate that the element "subjecting the clear toner overcoat and the at least pentachrome color image to a gloss enhancing process" found in claims 1 and 5 of the '582 Patent occurs "through a system which includes a TEC Lighting Production Coater whereby the UV Coater produces the highest quality, glossy coated image." (Dkt. 221[6] at 809, 957).

Plaintiff identifies nothing in its Final Infringement Contentions identifying fusing as a gloss enhancing process. As to application of the clear overcoat, there is no reference to this as satisfying the gloss enhancing process element of claims 1 and 5 of the '582 Patent. The language that Plaintiff points to (which indicates that the clear toner overcoat "enhance[s] photos" and can "simulate a pearlescent or metallic sheen" (*see* Dkt. 253-2 at 2)) appears in connection with the prior element of these claims—that is, "depositing a clear toner overcoat to the at least pentachrome color image, wherein the clear toner overcoat is formed as a receiver and image dependent inverse mask." (*See* Dkt. 221 at 808, 816).

It is true that "[t]he scope of infringement contentions and expert reports are not . . . coextensive." *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690, 699 (E.D. Tex. 2014). However, it is clear that Plaintiff's Final Infringement Contentions would not have put

---

[6]     The parties have referred in their papers to the red-lined version of Plaintiff's Final Infringement Contentions submitted to Judge Payson in connection with the motion to amend. The Court has accordingly done the same.

Defendant on notice of Plaintiff's newly-proffered theories that fusing or applying additional clear overcoat constitute gloss enhancing processes.  *See Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *14 (N.D. Cal. Feb. 23, 2014) (because the purpose of local patent rules requiring service of infringement contentions is "to establish the universe of infringement theories that will be litigated in any given case," ambiguities should be construed against the party claiming infringement); *see also Corus Realty*, 2020 WL 488545 at *7 ("Local Patent Rule 120(c) requires contentions to identify 'specifically where each element of each Asserted Claim is found,' and mere implication is insufficient to meet this requirement."); *KlausTech,* 2018 WL 5109383, at *4 ("Implicit disclosures are contrary to the purpose of the local patent rules, which require parties to disclose the basis for their contentions in order to make them *explicit* and streamline patent litigation." (quotations omitted and emphasis in original)).

Second, Defendant contends that the Kahn Supplemental Report newly alleges that previously unidentified third-party products disclose a gloss enhancing process.  (Dkt. 237-9 at 2).  Plaintiff asserts that its Final Infringement Contentions "disclose allegations of third-party UV coaters meeting the claim element of a 'gloss enhancing process,' including the TEC Lighting Production UV Coater."  (Dkt. 253-2 at 3).  Plaintiff mischaracterizes its Final Infringement Contentions.  The TEC Lighting Production UV Coater is the <u>only</u> third-party UV coater identified in its Final Infringement Contentions as meeting the claim element of a gloss enhancing process.  (Dkt. 221 at 809, 817-18).  To the extent the Kahn

Supplemental Report identifies additional third-party UV coaters as satisfying this claim element, these are new theories of infringement. *See California Inst. of Tech. v. Hughes Commc'ns, Inc.*, No. 2:13-CV-07245 MRP JEM, 2015 WL 11120845, at *1 (C.D. Cal. Apr. 13, 2015) ("Caltech is limited to the theories of infringement discussed in its infringement contentions. It is irrelevant that newly accused components may appear in the above products. Caltech's infringement contentions do not discuss the specific operation of these components or create a theory of infringement for these components.").

Third, Defendant argues that the Kahn Supplemental Report newly alleges joint infringement, "arguing that Xerox 'directs or controls' customers who perform the claimed method and who operate the claimed system." (Dkt. 237-9 at 2). Plaintiff argues that joint infringement is merely a legal theory that it intends to use to prove the direct infringement allegations contained in its Final Infringement Contentions. (Dkt. 253-2 at 4).

Plaintiff's argument ignores the express requirements of Local Patent Rule 3.1(d), which states that "[i]nsofar as any alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described." In its papers, Plaintiff does not identify any portions of its Final Infringement Contentions that comply with this requirement, instead referring generally to its citation of various "operating guides and training documents" that it claims "show[] how Xerox directs and controls its customers' infringing actions[.]" (Dkt. 253 at 11). The Court does not find that these citations satisfy the requirements of Local Patent Rule 3.1(d), because they are

not descriptions of the role each party played in the alleged joint infringement.  Indeed, when asked at oral argument where in its Final Infringement Contentions the Court could find the description required by Local Patent Rule 3.1(d), Plaintiff's counsel could not point to any particular section thereof, but contended that the requisite description could be inferred.  However, as noted above, the Local Rules require specificity and "[i]mplicit disclosures are contrary to the purpose" thereof.  *KlausTech,* 2018 WL 5109383, at *4.

Fourth, Defendant argues that in the Kahn Supplemental Report, Plaintiff "newly alleges printer features as meeting the 'receiver and image dependent' inverse mask limitation, including paper handling, auto density control, intelligent fusing, and several others." (Dkt. 237-9 at 2).  Plaintiff contends that its Final Infringement Contentions do disclose paper handling, auto density control, and intelligent fusing in reference to "receiver and image dependent mask," including by disclosing that the printer at issue "permits the clear toner overcoat to be formed as a receiver and image dependent reverse mask such as by permitting one to highlight images to add visual interest, accentuate a headline and variable text, enhance photos, logs, or variable images, simulate a pearlescent or metallic sheen, and/or apply watermarks to enhance security with the clear dry ink from which the receiver is formed." (Dkt. 253-2 at 5).  The Court agrees with Plaintiff that the explanation in its Final Infringement Contentions is sufficient to have put Defendant on notice of the theories set forth in the Kahn Supplemental Declaration regarding this issue.  Plaintiff's Final Infringement Contentions describe generally some ways in which the

printer at issue may adjust to different receiver (that is, paper type) and imaging conditions, while the Kahn Supplemental Support provides more specific information obtained via discovery. *See California Inst. of Tech.*, 2015 WL 11120845, at *1 ("In determining whether to strike the challenged portions of [an expert] report, this Court must consider whether the report advances a new theory, or whether the challenged report section merely provides an evidentiary example or complementary proof in support of the infringement contentions." (quotation omitted)).

Defendant's fifth and final argument as to the '582 Patent is that the Kahn Supplemental Report "newly alleges that 'clear' is a fifth 'color pigment' that can be combined with CMYK[7] to create a 'pentachrome color image.'" (Dkt. 237-9 at 2 (alteration omitted). Plaintiff contends that its Final Infringement Contentions did disclose this theory, by stating that "[f]or example, Xerox Printer combine[s] four pigments such as the CMYK dry inks with a fifth pigment color, such as orange, green, or blue to form a pentachrome image" and that a clear, dry ink could be placed in the fifth print station. (Dkt. 253-2 at 6).

The Court again finds that Plaintiff has mischaracterized its Final Infringement Contentions. Nothing in Plaintiff's Final Infringement Contentions sets forth a theory that "clear" can constitute the necessary fifth color pigment. To the contrary, Plaintiff's Final Infringement Contentions state that "Xerox Printer's dry ink of the fifth color may be

---

[7]     In this context, CMYK refers to cyan, magenta, yellow, and black.

substituted with a clear dry ink in the fifth print station to deposit a clear toner overcoat on a second pass through the printer <u>after</u> a pentachrome image has been produced in a first, preceding pass."   (Dkt. 221 at 807 (emphasis added)).   In other words, the Final Infringement Contentions do not describe a process where a clear dry ink is used as the fifth color pigment; they describe a process where a clear dry ink is applied <u>after</u> the pentachrome image has been created.

### b. The '415 Patent

The '415 Patent issued on August 23, 2011, and is entitled "Method and Apparatus for Printing Using a Tandem Electrostatographic Printer."  (Dkt. 247-53 at 2).  It relates "to methods and systems for printing using five or more color pigments, and applying a clear toner overcoat in addition to the five or more color pigments."  (Dkt. 185 at 9 (citation omitted)).  As noted above, Plaintiff claims infringement of claim 1 of the '415 Patent, which provides as follows:

> A system for printing color images comprising: a tandem color electrostatographic printer apparatus having five or more color printing stations for applying respective color separation toner images to a receiver member passing therethrough in a single pass to form a pentachrome color image; a fusing station for fusing the pentachrome image; a clear toner overcoat printing station for applying a clear toner overcoat to the fused pentachrome toner image; and a belt glosser for providing enhanced gloss to the pentachrome color image having the clear toner overcoat.

(Dkt. 247-53 at 18).

Defendant has identified five issues related to the '415 Patent in Defendant's Motion to Strike.  First, Defendant contends that in the Kahn Supplement Report, Plaintiff "newly

alleges that a fuser that transports paper on a belt is a 'belt glosser' because it 'uses a belt to move the receiver through the fuser station.'"  (Dkt. 237-9 at 3).  Plaintiff contends that its Final Infringement Contentions disclose a "belt glosser such as the belt that is moving within the unit" and explain that a clear toner overcoat is applied on the belt to enhance photos and simulate a pearlescent or metallic sheen.  (Dkt. 253-3 at 7).

Again, Plaintiff mischaracterizes its Final Infringement Contentions.  The reference therein to "the belt that is moving within the unit" refers specifically to the belt moving within the third-party Duplo 145A UV Coater.    (Dkt. 221 at 836).  It is not a general reference to any belt moving within the accused instrumentality.  Plaintiff may not sift through its Final Infringement Contentions for ambiguous references to argue implicit support for an infringement theory.  Such a practice is antithetical to the purposes of the Local Patent Rules.  The Court agrees that the Final Infringement Contentions do not disclose a theory wherein the fuser is the necessary belt glosser.

Second, Defendant argues that the Kahn Supplemental Report "newly alleges [that] third party products never before identified disclose a 'belt glosser.'"  (Dkt. 237-9 at 3). Plaintiff's response to this argument is non-responsive—it states that it "disclosed allegations of third-party coaters meeting the claim element of a 'gloss enhancing process,' including the TEC Lighting Production UV Coater [sic]."  (Dkt. 253-2 at 8).  However, no "gloss enhancing process" element is at issue here.  Moreover, Defendant is correct that the Final Infringement Contentions identify a single third-party product as disclosing a belt

glosser—the Duplo 145A/205A UV Offline Coater.  (Dkt. 221 at 835-36).  No other infringement theories involving using third-party products as belt glossers were disclosed. *See Finjan, Inc. v. Symantec Corp.,* No. 14-cv-02998-HSG-JSC, 2018 WL 620169, at *2 (N.D. Cal. Jan. 30, 2018) (a plaintiff cannot identify in an expert report a "new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions").

Third, the parties have a dispute regarding joint infringement that is essentially identical to the dispute discussed above with respect to the '582 Patent.  (*See* Dkt. 237-9 at 3; Dkt. 253-2 at 9).  For the reasons discussed above, the Court finds that Plaintiff did not properly disclose a joint infringement theory as required by Local Patent Rule 3.1(d).

Fourth, Defendant argues that the Kahn Supplemental Report "newly alleges that 'clear' is a fifth 'color printing station' that can be combined with CMYK to create a 'pentachrome color image.'"  (Dkt. 237-9 at 3 (alteration omitted)).  Plaintiff contends that its Final Infringement Contentions "disclose that clear toner can be used in the 5th Print Station to form a pentachrome color image," citing a graphic that shows "orange, green, blue, white, and clear as color options for the 5th Print Station."  (Dkt. 253-2 at 10).

While the graphic Plaintiff points to is included in the Final Infringement Contentions, Plaintiff has ignored the text of its Final Infringement Contentions, which state: "Xerox Printer is an electrostatographic printer having five dry ink print stations (color printing stations) as illustrated by four vertically-disposed, tandem stations having

the dry inks for the standard CMYK (cyan, magenta, yellow, black) pallet of four colors, and a fifth print station . . . for a fifth dry ink <u>having a color of orange, green, blue, or white</u>." (Dkt. 221 at 830 (emphasis added)). Plaintiff made no mention in the text of its Final Infringement Contentions of a theory whereby clear dry ink would be combined with CMYK to form a pentachrome image, and it cannot now create such a theory by implication from a graphic.

Finally, Defendant's fifth issue related to the '415 patent is an argument that Plaintiff has impermissibly newly alleged a theory of infringement under the doctrine of equivalents[8] by claiming that CMYK and clear "can be follow by a second pass of 'clear.'" (Dkt. 237-9 at 4). Plaintiff contends that its Final Infringement Contentions disclose this doctrine of equivalents argument because: (1) the Final Infringement Contentions allege a doctrine of equivalents theory that "[t]he Xerox Printer performs substantially the same function because, after the pentachrome image of four colors CMYK (cyan, magenta, yellow, black) and fifth color of orange, green, blue, or white is fused on a sheet of papers, a clear toner (i.e. clear dry ink) could be installed in one of the five color printing stations to become a clear toner overcoat printing station"; and (2) "as described with respect to Issue 4 of the '415 Patent, the infringement contentions show that a clear toner can be the

---

[8]     Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).

5th station." (Dkt. 253-2 at 11). In other words, Plaintiff's argument incorporates and relies upon an argument already rejected by the Court (namely, that the graphic showing "clear" as an option for the fifth print station somehow overcomes the express text stating that the fifth dry ink used to create the pentachrome image will have a color of orange, green, blue, or white). This argument therefore also fails.

### c.   The '3005 Patent

The '3005 Patent issued on March 20, 2001, and is entitled "Feeder Apparatus for Documents and the Like." (Dkt. 247-59 at 2). It deals generally with "an apparatus for engaging and removing a sheet of paper or other material from a stack and feeding it along a path. The system generally consists of a skimmer, a bumper, a separator, and a guide plate." (Dkt. 185 at 14 (citation omitted)). As noted above, Plaintiff alleges infringement of claim 1 of the '3005 Patent, which provides as follows:

> A sheet feeder comprising: (a) a skimmer for engaging and removing a sheet from one end of a stack of sheets and feeding the engaged sheet edgewise along a feed path, said skimmer comprising a first friction element including a generally cylindrical endless rotating peripheral surface carried on a support defined at least in part by a rotating shaft; (b) a separator spaced downstream along the feed path from the skimmer for advancing the engaged sheet while retarding any adjacent sheets; and (c) a first guide plate extending between said skimmer and said separator substantially parallel to said feed path to guide the engaged single sheet substantially along the feed path, preventing buckling of the engaged single sheet perpendicular to the feed path, wherein said first guide plate is supported at least in part by and mounted to be pivotable independent of the rotation of said rotating shaft with respect to said support.

(Dkt. 247-59 at 22).

- 21 -

Defendant raises a single issue regarding the '3005 Patent.  Specifically, Defendant argues that the expert report of Carl Nelson, Ph.D. dated June 2, 2021 (the "Nelson Report") (Dkt. 280-2) "newly alleges that feed trays of the WorkCentre 5300 Series other than the 'upper feeder' in the Duplex Automatic Document Feeder ('DADF') or the 'high-capacity feeder' meet the limitations of claim 1."  (Dkt. 237-9 at 4).  Plaintiff responds that its Final Infringement contentions disclose each sheet feeder of the WorkCentre 5300 including the 'Document Feeder' and a 'High Capacity Feeder and Office LX Finisher Options.'"  (Dkt. 253-2 at 12 (citations omitted)).

Again, Local Patent Rule 3.1(c) requires the party claiming infringement to "identify[] <u>specifically</u> where each limitation of each asserted claim is found within each Accused Instrumentality[.]" (emphasis added).  In its Final Infringement Contentions, Plaintiff identified the "document feeder" and the "high-capacity feeder" as the parts of the WorkCentre 5300 Series that meet the "sheet feeder" limitation of claim 1 of the '3005 Patent.  (Dkt. 221 at 55).  Plaintiff did not disclose an infringement theory wherein any other aspect of the WorkCentre 5300 Series constituted the necessary sheet feeder. Accordingly, the Court agrees that the identified paragraphs of the Nelson Report contain new infringement theories.

### d.   The '255 Patent

The '255 Patent issued on September 13, 2011, and is entitled "Alignment Method for a Plurality of Coupled Digital Print Engines."  (Dkt. 247-67 at 2).  It relates generally

to "methods and systems for aligning printing engines in a printing system." (Dkt. 185 at 5 (citation omitted)). As noted above, Plaintiff claims infringement of claim 12 of the '255 Patent, which provides as follows:

> An apparatus for digitally printing comprising: a plurality of electrophotographic printing engines each in one of two or more of different print assemblies that are capable of printing on a receiver to form one or more final prints wherein the print engines are alignable in an x, y, and z direction relative to a receiver path cross track reference for sequentially printing on a receiver wherein the receiver path cross track reference is based on measurements in the cross track direction (z direction) relative to the receiver path cross track reference; a measurement device to measure a location of a receiver in the receiver path at a final one of the sequences of print assemblies; and an alignment device to align the two or more printing engines in the cross track direction (z direction) relative to the receiver path cross track reference based on the measurement.

(Dkt. 247-67 at 17).

Defendant has identified a single issue related to the '255 Patent. Specifically, Defendant argues that in the Nelson Report, Plaintiff "newly alleges that the Phaser 6500 discloses an 'alignment device' because it 'uses mirrors and laser diodes that emit laser beams to align the images for transfer onto the receiver.'" (Dkt. 237-9 at 4). Plaintiff claims that its allegation that the Phaser 6500 uses mirrors and laser diodes that emit laser beams to align the images for transfer onto the receiver is "further detail" of the contention in its Final Infringement Contentions that the Phaser 6500 "includes an alignment device such as a user interactive control panel on which a user can use to align two or more printing engines. . . ." (Dkt. 253-2 at 13).

In its papers, Plaintiff proffers no explanation for how the mirrors and laser diodes identified in the Nelson Report constitute a "user interactive control panel" as disclosed in its Final Infringement Contentions. There is no indication in the Nelson Report that a user can interact with these mirrors and laser diodes; to the contrary, the accompanying schematic makes clear that they are internal mechanisms. (Dkt. 280-2 at 124). When asked about this issue at oral argument, Plaintiff's counsel contended that the mirrors and laser diodes are part of the user interactive control panel because their movement can ultimately be traced back to user input. However, there is no indication in the record before the Court that the user interactive control panel described in the Final Infringement Contentions directly controls the mirrors and laser diodes discussed in the Nelson Report. The Court is accordingly unpersuaded by Plaintiff's argument that the new allegations in the Nelson Report merely provide "further detail" regarding the identified user interactive control panel.

### e.     The '285 Patent

The '285 Patent issued on April 6, 2004, and is entitled "Operator Replaceable Component Life Tracking System." (Dkt. 247-68 at 2). It "relates to the maintenance of printer systems, and more particularly to methods and systems for operator maintenance of printing systems that include Operator Replaceable Component (ORC) devices that have a predictable lifetime before the ORC devices have to be replaced." (Dkt. 185 at 14 (citation

omitted)).  As noted above, Plaintiff alleges infringement of claims 1 and 14 of the '285

Patent, which provide as follows:

> [Claim 1:] A system with operator enabled maintenance comprising: at least
> one computational element within said system; a plurality of operator
> replaceable component (ORC) devices within said system, each of said ORC
> devices having an expected life span; a use mechanism coupled to each said
> computational element and said ORC devices, said use mechanism tracking
> use of at least one of said ORC devices using a predetermined parameter; a
> comparison mechanism that compares use of said ORC devices to said
> expected life span; and an operator alert mechanism responsive to said
> comparison mechanism to provide said operator alert when the result of said
> comparison satisfies a predetermined parameter representing at least one of
> said expected life spans where said expected life span for a single of said
> ORC devices is the shortest expected life span.

> [Claim 14:] A method for providing operator maintenance on a system
> having a plurality of operator replaceable component devices, comprising:
> providing the expected life span of each of the operator replaceable
> component devices; determining a remaining life span for the operator
> replaceable component device having the shortest expected life span;
> comparing said remaining life span with a predetermined threshold;
> responding to a result of the comparing step indicating that said
> predetermined threshold has been exceeded; and notifying the operator on a
> periodic basis that said predetermined threshold has been exceeded.

(Dkt. 247-68 at 13-14).

Defendant raises three issues regarding the '285 Patent, the expert report of Larry

Stauffer, Ph.D. dated June 1, 2021 (the "Stauffer Report") (Dkt. 280-3), and the errata to

the Stauffer Report (the "Stauffer Errata") (Dkt. 280-6).   The first two of these issues are

related, and arise out of this Court's construction of certain limitations of claim 1 of the

'285 Patent as "means-plus-function" limitations.[9]  (*See* Dkt. 185 at 53-54).   The Local Patent Rules provide clear instructions for means-plus-function limitations.  First, Local Patent Rule 3.1(c)(i) provides that for such limitations, the party claiming infringement must identify specifically "the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function[.]"  Further, where the Court's claim construction decision requires amendments to a party's Final Infringement Contentions, that party is required to file a "motion to amend final contentions . . . with proposed amendment(s) within fourteen (14) days of the entry of such claim construction order."  L. Pat. R. 3.10(a).

Here, the parties disputed whether the terms "a use mechanism coupled to each said computational element and said ORC devices, said use mechanism tracking use of at least one of said ORC devices using a predetermined parameter" and "a comparison mechanism that compares use of said ORC devices to said expected life span . . . where said expected life span for a single of said ORC devices is the shortest expected life span," both of which are found in claim 1 of the '285 Patent, were means-plus-function limitations, with Plaintiff taking the position that they were not and Defendant taking the position that they were. (*See* Dkt. 185 at 53-54).  The Court agreed with Defendant.  (*Id*.).

---

[9]     "Means-plus-function limitations are governed by 35 U.S.C. § 112, ¶ 6, which provides: An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure in support thereof, and such claim shall be construed to cover the corresponding structure described in the specification and equivalents thereof."  *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (original alterations omitted).

Understandably, Plaintiff's Final Infringement Contentions—which were served prior to issuance of the Court's claim construction decision—did not treat the limitations at issue as means-plus-functions limitations and did not specifically identify the structures that perform the claimed functions.  But Plaintiff never sought to correct these omissions after the Court's claim construction decision was issued, as required by Local Patent Rule 3.10(a).

Plaintiff's arguments on this issue are unpersuasive.  Plaintiff initially argues that Local Patent Rule 3.1(c)(i) does not apply here, because it is phrased as referring to "each limitation that [the party claiming infringement] contends is governed by 35 U.S.C. § 112 ¶ 6," and Plaintiff "has never taken the position that any of the claim terms . . . should be construed as means-plus-function terms."  (Dkt. 253 at 9-10).  Plaintiff's semantic argument "ignores the entire purpose of the rules." *Fluidigm Corp. v. IONpath, Inc.*, No. C 19-05639 WHA, 2020 WL 5073938, at *5 (N.D. Cal. Aug. 25, 2020) (rejecting patent owner's argument that "because it construes no terms as means-plus-function limitations, it need not disclose its means-plus-function infringement theory in its contentions because Rule 3-1(c) only requires disclosure 'for each limitation that [a] party [does] contend[ ] is governed by 35 U.S.C. § 112(6).'" (alterations in original)).  Moreover, while Plaintiff may not have originally taken the position that the claim terms at issue were means-plus-function limitations, it now "affirmatively seeks to assert these new theories against"

- 27 -

Defendant. *Id*. Plaintiff cannot avoid its obligation to particularize its infringement theories by noting that it disagrees with the Court's claim construction rulings.

Moreover, Plaintiff's contention that the "factual support" it is "relying on to meet the Court's construction" of the claim terms at issue is contained in the Final Infringement Contentions (*see* Dkt. 253-2 at 13-14) again misses the point. The Local Patent Rules do not allow for such an approach. The party defending against a claim of infringement is not required to hunt through infringement contentions to piece together possible theories; the party claiming infringement is required to set such theories forth clearly and with specificity. *See Thought, Inc. v. Oracle Corp.*, No. 12-CV-05601-WHO, 2016 WL 3230696, at *6 (N.D. Cal. June 13, 2016) ("The purpose of requiring parties to disclose the basis for their contentions is to make them *explicit* and streamline patent litigation." (emphasis in original)), *aff'd,* 698 F. App'x 1028 (Fed. Cir. 2017). The Court does not find that Plaintiff's Final Infringement Contentions disclose the theories set forth in the Stauffer Report regarding these means-plus-functions limitations.

Defendant's third and final argument related to the '285 Patent is that the Stauffer Errata contains a new contention that "the color toner cartridges are the operator replaceable component with the 'shortest expected life span.'" (Dkt. 237-9 at 5). Plaintiff contends that its Final Infringement Contentions "disclose color toner cartridges as operator replaceable components with the 'shortest expected life span'" because they list color cartridges as "having [a] life span of 6,000 pages." (Dkt. 253-2 at 16).

- 28 -

This is another instance in which Plaintiff relies on a graphic while ignoring the explicit text of its Final Infringement Contentions.   Plaintiff's Final Infringement Contentions are clear that, in the infringement theory presented, "the expected life span for the Black toner is the shortest."  (Dkt. 221 at 538, 552).  While the Final Infringement Contentions also contain graphics showing cyan, magenta, and yellow toner cartridges with outputs of only 6,000 pages (*see id*. at 542, 543), those graphics are not presented in connection with a disclosure of the operator replaceable component with the shortest expected life span, and accordingly do not set forth the infringement theories now asserted by Plaintiff.

### f.   The '314 Patent

The '314 Patent issued on June 25, 2002, and is entitled "System and Method for Representing and Controlling a Production Printing Workflow."  (Dkt. 247-11 at 2).  It relates generally to "systems and methods for the control of printer workflows."  (Dkt. 185 at 16 (citation omitted)).  As noted above, Plaintiff alleges infringement of claims 1 and 51 of the '314 Patent, which  provide as follows:

> [Claim 1:] An interface, implemented in a computer, for representing and controlling a production printing workflow comprising: a display; a first document object representing a document, said document further comprising content and formatting, said formatting defining at least one page in said document, said first document object being associated with a first visual representation on said display; a document ticket object representing global document attributes, said document ticket object being associated with a second visual representation on said display and capable of being associated with said first document object; a page object representing a page attribute of one of said at least one page, said page object being associated with a third

visual representation on said display and capable of being associated with said first document object; and a first user input device for selectively associating at least two of said first, second and third visual representations, wherein association of said first, second and third visual representations results in association of said respective objects.

[Claim 51:] A method of controlling a production printing work-flow comprising: (a) displaying, on a display, a first visual representation of a first document object representing a document on a display; (b) displaying, on said display, a second visual representation of a document ticket object representing global document attributes capable of being associated with said document; (c) selectively associating said first visual representation with said second visual representation; and (d) based on (c), linking said global document attributes with said document such that said global document attributes apply to said document.

(Dkt. 247-11 at 20-22).

Defendant raises seven issues related to the '314 Patent and the expert report of Michael Mitzenmacher, Ph.D., dated June 2, 2021 (the "Mitzenmacher Report") (Dkt. 280-4). First, Defendant contends that the Mitzenmacher Report "newly adds an accusation" that Defendant's "Freeflow Makeready" product infringes claims 1 and 51 of the '314 Patent. (Dkt. 237-9 at 5). Plaintiff contends that its Final Infringement Contentions "disclose the FreeFlow Software Solution, which Xerox engineers refer to as the 'FreeFlow Product,' as the accused product, and specifically disclose FreeFlow Makeready of infringing claims 1 and 51 of the '314 Patent." (Dkt. 253-2 at 16-17).

The Court agrees with Plaintiff that its Final Infringement Contentions adequately disclose the FreeFlow Makeready as an accused instrumentality. Plaintiff's Final Infringement Contentions refer generally to "Xerox Freeflow" and note that it is included

in a number of accused printers, "either alone, or when used in conjunction with other products including at least: Xerox FreeFlow Core; and Xerox FreeFlow Express to Print." (Dkt. 221 at 113).  The Final Infringement Contentions go on to incorporate documents in which FreeFlow Makeready is listed along with FreeFlow Core as products to be used with Xerox FreeFlow.  (*Id*. at 117).   The Final Infringement Contentions then expressly state that Xerox FreeFlow satisfies one of the relevant claim elements by "operating in combination with FreeFlow Output Manager [to] format[] at least one page of the document when it defines performs procedures to handle preflight, imposition, scripting, submission, ticketing, job previewing, and the like, using FreeFlow Process Managers, FreeFlow Express to Print, and/or <u>FreeFlow Makeready</u>."  (*Id*. at 127 (emphasis added)).

Second, Defendant contends that a list of more than 30 "Xerox controllers and printers" contained in the Mitzenmacher Report are newly accused.  (Dkt. 237-9 at 5).  This argument lacks merit.  The Xerox controllers and printers at issue are listed by name and model number in the Final Infringement Contentions and accused of, in combination with Xerox FreeFlow, infringing claims 1 and 51 of the '314 Patent.  (*See, e.g.,* Dkt. 221 at 113, 171).[10]

---

[10]    There are slight variations in how some of the printers and controllers are denoted. For example, the Final Infringement Contentions refer to the "DocuTech 128 HighLight Colour, DocuTech 155 HighLight Colour, DocuTech 180 HighLight Colour" (Dkt. 221 at 113), while the Mitzenmacher Report refers to the "DocuTech 128/155/180 Highlight Color System" (Dkt. 28-4 at ¶ 69).   However, because Defendant has provided no elaboration on its assertion that the allegations regarding the printers and controllers are newly added, the Court cannot conclude that these slight naming variations are meaningful.

Third, Defendant contends that the Mitzenmacher Report newly adds a doctrine of equivalents infringement theory for the "a first user input device for selectively associating at least two of said first, second and third visual representations" limitation of claim 1. (Dkt. 237-9 at 5). Plaintiff asserts that its Final Infringement Contentions "disclose [doctrine of equivalents] theories regarding how the FreeFlow Software Solution[] infringes the '314 Patent." (Dkt. 253-2 at 18). However, Plaintiff's Final Infringement Contentions do not contain a doctrine of equivalents theory for the claim limitation identified by Defendant. (*See* Dkt. 221 at 139-42, 244-48). Plaintiff has failed to offer a persuasive rationale for how setting forth doctrine of equivalents theories for other, different limitations would have put Defendant on notice that it was pursuing a doctrine of equivalents theory as to this specific limitation. *See* Local Patent Rule 3.1(e) (requiring party claiming infringement to expressly state "whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality" (emphasis added)).

The fourth issue Defendant raises relates to a joint infringement argument set forth in the Mitzenmacher Report. (Dkt. 237-9 at 5). While Plaintiff contends that the "factual allegations" supporting its joint infringement theories are contained in its Final Infringement Contentions (Dkt. 253-2 at 18), again, Local Patent Rule 3.1(d) requires a specific description of the role that each party played in any alleged joint infringement. No such description was provided in the Final Infringement Contentions.

Fifth, Defendant argues that the Mitzenmacher Report contains a new infringement theory for claim 1 pursuant to which a "page object" is a "tab label object" with "a visual representation of a page object" in the "tab label window." (Dkt. 237-9 at 5-6). The Court disagrees that this is a new infringement theory. The Final Infringement Contentions contain a screenshot and state "the page object can include all content (i.e., text, images) displayed in the screenshot, or portions thereof." (Dkt. 221 at 137 (emphasis added)). That screenshot includes text annotation properties, consistent with the Mitzenmacher Report. The Court is not persuaded by Defendant's contention that the Final Infringement Contentions limited the "page object" to the "'page view attribute data' that is shown on the 'page view.'" (Dkt. 237-9 at 6).

Sixth, Defendant argues that the Mitzenmacher Report adds a new infringement theory for claim 1, arguing that a "first input device" is a "mouse, keyboard, and the corresponding code." (Dkt. 237-9 at 6). The Court agrees with Defendant that this infringement theory is not included in the Final Infringement Contentions, which describe the first input device as "one or more input processing software modules." (Dkt. 221 at 139). Significantly, Plaintiff recognized this deficit in its Final Infringement Contentions, and explicitly sought by prior motion to amend its Final Infringement Contentions to state "Xerox FreeFlow meets this claim language because the Accused Printers operating Xerox FreeFlow have hardware devices, including a touchscreen, a keyboard, and a mouse, that allow a user to selectively associate two or more visual representations." (*Id.*). However,

Judge Payson denied this aspect of Plaintiff's motion for leave to amend, finding that Plaintiff had not been diligent in seeking such leave.  (Dkt. 213 at 26).  Plaintiff cannot now circumvent Judge Payson's ruling by nevertheless pursuing this undisclosed theory.

The Court finds no merit in Plaintiff's contention that because it characterized its proposed amended infringement allegations as supporting indirect infringement theories in its motion to amend, it is of no moment that the relevant portions of that motion were denied.  (*See* Dkt. 253 at 8).  The fact remains that Plaintiff sought specifically to amend its Final Infringement Contentions to assert that the input device limitation was met by hardware devices including a touchscreen, a keyboard, and a mouse, and it was denied permission to do so.  The Court is wholly unpersuaded by Plaintiff's belated and unsupported assertion that such amendment was unnecessary because its Final Infringement Contentions already "disclose hardware devices, such as a computer, mouse, keyboard, display, etc. as input devices."  (*Id*. at 9).  A simple review of Plaintiff's Final Infringement Contentions demonstrates that this is inaccurate, and Plaintiff clearly was aware of that fact when it sought and was denied leave to amend.

Seventh and finally, Defendant contends that the Mitzenmacher Report contains a new infringement theory for claims 1 and 51 of the '314 Patent, wherein the claim term "selectively associating" is met by using an input device to "edit an object in one view of FreeFlow Express to Print."  (Dkt. 237-9 at 6).  The Court agrees.  There is no mention of this infringement theory in Plaintiff's Final Infringement Contentions, which describe the

selective association as occurring when Xerox FreeFlow's "input processing software modules assist in the production of a printed document via the main interface." (Dkt. 221 at 140; *see also id*. at 169-170). The single graphic that Plaintiff points to as purportedly disclosing this infringement theory (*see* Dkt. 253-2 at 21) shows an entirely different view of FreeFlow Express to Print than the one shown in the Mitzenmacher Report (*see* Dkt. 280-4 at ¶ 184).

### g.    The '974 Patent

The '974 Patent issued on January 21, 2003, and is entitled "Automated Job Creation for Job Preparation." (Dkt. 247-20 at 2). It relates generally to "systems and methods for the control of printer workflows." (Dkt. 185 at 22 (citation omitted)). As noted above, Plaintiff claims infringement of claims 1 and 2 of the '974 Patent, which provide as follows:

> [Claim 1:] A method for providing production printing instructions relating to a printed end document to a job preparation station, . . . the method comprising: receiving the plurality of documents in electronic format from a job submission station operator, and transmitting the documents in electronic format to a computer; placing said plurality of documents into an electronic folder in the computer; arranging the plurality of documents in said folder in the order the documents are to be printed in the printed end document; said computer automatically converting the plurality of documents into a ready for printer format and merging the plurality of documents together to create a single document in said ready for printer format where the plurality of documents comprise a main portion and at least one exception page; delaying the printing of the main portion at a production device associated with the single document, while the at least one exception page is printed at an alternate output device; receiving at the production device the at least one exception page from the alternate output device; printing at the production device the main portion and where the production device collates the at least

one exception page with the main portion; and said computer automatically creating an electronic job ticket providing global attributes for the printed end document.

[Claim 2:] A system for providing production printing instructions for a printed end document to a job preparation station, wherein said printed end document comprises a plurality of documents in a predefined order, said plurality of documents each comprising content and document formatting, said system comprising: a job submission station having a computer; a receiver to receive said plurality of documents in electronic format from a job submission station operator, said receiver disposed at said job submission station and connected to transmit said documents in electronic format to said computer; an input device connected to said computer for said job submission station operator to input instructions to said computer, said instructions operative to control features of said plurality of documents, wherein said control comprises at least one of manage, edit, modify and add feature; said computer programmed to: (1) receive input instructions from said operator through said input device to place said plurality of documents into an electronic folder, and arrange said plurality of documents in said folder in the order said documents are to be printed in the printed end document; (2) automatically convert the plurality of documents into a ready for printer format and merge the plurality of documents together to create a single document in said ready for printer format; and (3) create an electronic job ticket providing global attributes for the printed end document, wherein the plurality of documents are merged to create the single document, where the plurality of documents comprise a main portion and at least one exception page, where the printing of the main portion is delayed at a production device associated with the single document, while the at least one exception page is printed at an alternate output device where the production device prints the main portion and where the production device collates the at least one exception page with the main portion.

(Dkt. 247-20 at 22-23).

Defendant has raised 12 issues related the '974 Patent and the Mitzenmacher Report. First, Defendant contends that the Mitzenmacher Report adds new accusations that Defendant's FreeFlow Output Manager, FreeFlow Process Manager, and the FreeFlow Print Server products infringe claims 1 and 2 of the '974 Patent. (Dkt. 237-9 at 6). The

Court disagrees that these are new allegations. The Final Infringement Contentions specifically describe the use of FreeFlow Output Manager and FreeFlow Print Server in connection with Plaintiff's claims of infringement of the '974 Patent. (*See, e.g.,* Dkt. 221 at 478-81, 483-85). As to FreeFlow Process Manager, Plaintiff contends that this product is a successor to FreeFlow Core, which is expressly referenced throughout the Final Infringement Contentions. (*See* Dkt. 253-2 at 22). Defendant has not responded to that aspect of Plaintiff's arguments, and the Court cannot resolve a factual dispute regarding the relationship between FreeFlow Process Manager and FreeFlow Core on the instant record.

Second, Defendant argues that a list of more than 30 "Xerox controllers and printers" contained in the Mitzenmacher Report are newly accused of infringing claims 1 and 2 of the '974 Patent. (Dkt. 237-9 at 6). This unelaborated argument lacks merit. The controllers and printers at issue are identified by name and model number in the Final Infringement Contentions as "Accused Printers." (Dkt. 221 at 463).

Defendant's third issue as to the '974 Patent relates to joint infringement. (Dkt. 237-9 at 6-7). For the reasons it has already set forth, the Court agrees that Plaintiff has not complied with the requirements of the Local Patent Rules regarding disclosure of joint infringement theories.

Defendant's fourth issue is also one the Court has already considered—namely, the failure to disclose doctrine of equivalents theories with respect to particular claim

limitations.  (*Id*. at 7).  Again, the Court agrees with Defendant that Plaintiff failed to disclose the identified doctrine of equivalents infringement theories, and that Plaintiff having disclosed doctrine of equivalents infringement theories for other, different limitations does not change that analysis.

Fifth, Defendant contends that the Mitzenmacher Report adds new infringement theories for claim 1 related to "arranging the plurality of documents" and for claim 2 related to "arrang[ing] said plurality of documents in said folder."  (Dkt. 237-9 at 7).  More particularly, Defendant claims that the Mitzenmacher Report accuses "hot folders, Manifest Automation, Xerox Programming Information Format job Ticket, Collect component, Job Group imposition, job queuing, and zip files" of satisfying these limitations, while the Final Infringement Contentions identified an "'organize pages' feature in Adobe" as doing so.  (*Id*.).

The Court does not find that Defendant has demonstrated that these aspects of the Mitzenmacher Report constitute new infringement theories.  Plaintiff's Final Infringement Contentions incorporate a video demonstration showing the functionality of the Xerox FreeFlow Core that Plaintiff states demonstrates the manner in which "Xerox FreeFlow merges the plurality of documents together to create a single document in said ready for printer format using features that, for example, combine files, export files in a particular format (e.g., PDF), and create files in a particular form (e.g., PDF)."  (Dkt. 221 at 472-473).  Defendant's papers do not discuss the contents of this video, and it is not the

obligation of this Court to perform its own independent investigation into what it may or may not show.   Plaintiff contends that the video demonstrates the relevant functionality in connection with the use of "hot folders, Manifest Automation, Xerox Programming Information Format job Ticket, Collect component, Job Group imposition, job queuing, and zip files" (Dkt. 253-2 at 24), and Defendant has not demonstrated to the contrary.

Sixth, Defendant argues that Plaintiff adds new infringement theories for claims 1 and 2 of the '974 Patent because the Mitzenmacher Report "accuses what it calls a Convert component" in connection with the claim limitation "automatically converting the plurality of documents."   (Dkt. 237-9 at 7).   Plaintiff asserts that the "Convert component" is disclosed in its Final Infringement Contentions because they state that the Xerox FreeFlow "exports files in a particular format (e.g., PDF), and create files in a particular form (e.g., PDF)."  (Dkt. 253-2 at 25).

The parties' briefing is of minimal use to the Court in resolving this dispute, and neither side was able to provide a meaningful explanation at oral argument of what Dr. Mitzenmacher is referencing when he discusses the so-called "Convert component." However, comparing the language of the Final Infringement Contentions, which state that "Xerox FreeFlow automatically converts the plurality of documents into a ready for printer format when it produces the document for print in a format that is recognizable to a production print engine and/or an inline finisher" (Dkt. 221 at 475), and the language of the Mitzenmacher Report, which states that "FreeFlow Core's Convert component

converts files to a ready for printer format, PDF" (Dkt. 280-4 at ¶ 250), it does appear to the Court that this constitutes a new, previously undisclosed theory.

Seventh, Defendant claims that the Mitzenmacher Report contains new infringement theories as to claims 1 and 2 of the '974 Patent "related to 'merging the plurality of documents together' where MASA's report accuses what is calls 'the Join component as well as . . . Imposition.'"  (Dkt. 237-9 at 7-8).   However, Defendant has again failed to provide the Court with any meaningful information regarding a video expressly referenced in the Final Infringement Contentions as showing the mechanism by which "Xerox FreeFlow merges the plurality of documents together to create a single document in [a] ready for printer format[.]" (Dkt. 221 at 474-75).  On this record, the Court does not find that Defendant has shown that these are new infringement theories.

Eighth, Defendant claims that Plaintiff has, in the Mitzenmacher Report, newly added infringement theories accusing a "color printer or monochrome printer" of satisfying the requirement of an "alternate output device."  (Dkt. 237-9 at 8).  The Court disagrees. Plaintiff's Final Infringement Contentions state that the "alternate output device" is "included within the set of Accused Printers" previously set forth, which includes color and monochrome printers.  (Dkt. 221 at 477-78, 504).

Ninth, Defendant argues that the Mitzenmacher Report "newly adds infringement theories for claim 2 of [the '974 Patent] that an 'input device' is a 'mouse, keyboard, or touchscreen monitor that is an input device.'"  (Dkt. 237-9 at 8).  The Court agrees.  This

is another instance in which Plaintiff seeks, through an expert report, to assert an infringement theory that it was not permitted to amend its Final Infringement Contentions to assert. Plaintiff sought leave to add the following to its Final Infringement Contentions: "Xerox FreeFlow meets this claim language because the Accused Printers operating Xerox FreeFlow have a mouse, keyboard, or touchscreen monitor that is an input device." (Dkt. 221 at 495-96). Judge Payson denied this request due to Plaintiff's lack of diligence. (Dkt. 213 at 26). That ruling is binding at this and all subsequent stages of this litigation.

Tenth, Defendant contends that the Mitzenmacher Report contains new infringement theories "for claims 1 and 2 [of the '974 Patent] related to delaying printing at a production device 'while the at least one exception page is printed' accusing Color Split, Finish, Collect Job Documents, Collect and Print options." (Dkt. 237-9 at 8). Defendant has failed to explain to the Court why the Color Split, Finish, Collect Job Documents, Collect and Print options would not fall within the language of the Final Infringement Contentions indicating that "Xerox FreeFlow coordinates functions performed by both a printer (production device) and a finisher (alternative device) in order to produce the printed document. For instance, Xerox FreeFlow can perform procedures that delay the performance of the printer producing the main portion of a document, while the finisher produces the one or more exception pages." (Dkt. 221 at 477). If Defendant's contention is that Plaintiff should have been more specific in its Final Infringement Contentions, it was incumbent on Defendant to provide the Court with more explanation

for that position than a single sentence stating that "MASA's infringement contentions failed to identify the particular software functions accused in MASA's expert report." (Dkt. 237-9 at 8).  On this record, the Court cannot find that these are new infringement theories.

Defendant's eleventh and twelfth arguments regarding the '974 Patent are essentially the same as its tenth (*see* Dkt. 237-9 at 8-9), and are rejected for the same reasons.  The general language used in the Final Infringement Contentions appears broad enough to encompass the Color Split, Finish, Collect Job Documents, Collect and Print options.  It is not this Court's obligation to extrapolate from the one sentence assertion that "MASA's infringement contentions failed to identify the particular software functions accused in MASA's expert report" (Dkt. 237-9 at 8-9) why Defendant believes this constitutes a failure to comply with the Local Patent Rules.

### h.    The '9005 Patent

The '9005 Patent issued on September 28, 2004, and is entitled "Method and System of Pre-Selecting Ordered Media in a Printing System."  (Dkt. 247-27 at 2).  It "relates to a method of pre-selecting 'ordered media'—such as tabs—so that any unwanted parts of the ordered media are removed prior to printing."  (Dkt. 185 at 21 (citation omitted)).  As noted above, Plaintiff claims infringement of claim 1 of the '9005 Patent, which provides as follows:

> A system for pre-selecting ordered media in a printing system, comprising:
> (a) an input source to store at least one set of the ordered media; (b) a user

interface having an input device to select the ordered media from a paper catalog, and to pre-select a first part of the ordered media set to be used in a print job and a second unwanted part of the ordered media set to be discarded; (c) a first job output; (d) a second job output; and (e) a central processing unit configured to send the first part of the ordered media set directly to the first job output and the second part of the ordered media set directly to the second job output.

(Dkt. 247-27 at 23).

Defendant raises seven issues regarding the '9005 Patent and the Mitzenmacher Report. However, these issues are not consecutively numbered—instead, Defendant's summary chart goes from "Issue 2" to "Issue 4," skipping over "Issue 3." (Dkt. 237-9 at 9). For ease of reference and to avoid confusion, the Court utilizes Defendant's numbering and refers to "Issue 4" as the fourth issue, and so forth.

The first of these issues is essentially the same as the first issue raised regarding the '974 Patent—namely, Defendant contends that the Mitzenmacher Report adds new accusations regarding Defendant's FreeFlow Output Manager, FreeFlow Process Manager, and the FreeFlow Print Server products. (Dkt. 237-9 at 9). Again, the Final Infringement Contentions specifically discuss the use of FreeFlow Output Manager and FreeFlow Print Server in connection with Plaintiff's claims of infringement of the '9005 Patent. (*See, e.g.,* Dkt. 221 at 656, 659-60, 662-63, 702, 707-08). There is also, as previously noted, a factual issue regarding the relationship between FreeFlow Process Manager and FreeFlow Core that cannot be resolved on the instant record. The Court thus does not find that these infringement theories are new.

- 43 -

Defendant's second argument regarding the '9005 Patent, like certain of its previous arguments, involves a list of Xerox printers and controllers that is explicitly included in the Final Infringement Contentions, and accordingly lacks merit. (*Compare* Dkt. 221 at 651, 694 *with* Dkt. 280-4 at 42-43, 53-55).

As previously noted, Defendant has not included an "Issue 3" related to the '9005 Patent in its summary chart.

Defendant's fourth argument regarding the '9005 Patent is a joint infringement issue. As the Court has previously explained, Plaintiff's Final Infringement Contentions do not comport with the Local Patent Rules insofar as they fail to describe the roles of each of the alleged joint infringers. The Court's prior analysis of this issue applies with equal force with respect to the '9005 Patent.

The fifth, sixth, and seventh issues related to the '9005 Patent are additional attempts by Plaintiff to evade Judge Payson's ruling on its motion for leave to amend. (*See* Dkt. 237-9 at 9-10; Dkt. 221 at 652, 656, 702-703). The Court need not belabor this point. Plaintiff cannot pursue infringement theories that it was denied leave to amend its Final Infringement Contentions because of its own lack of diligence.

Eighth and finally, Defendant contends that the Mitzenmacher Report adds a new infringement theory for claim 1 of '9005 Patent "regarding 'pre-selection of a first part of the ordered media set to be used in a print job and a second unwanted part of the ordered media set to be discarded[.]'" (Dkt. 237-9 at 10 (original alteration omitted)). The Court

agrees that this is a new infringement theory.   Plaintiff's Final Infringement Contentions expressly state that the "pre-selection" limitation is met by "selection of which pages of a document are to be used in a print job," and does not identify any of the other methods of pre-selection set forth in the Mitzenmacher Report.  (Dkt. 221 at 704).

### i.   <u>Remedy</u>

For the reasons set forth at length above, the Court agrees with Defendant that certain portions of the Kahn Supplemental Report, the Nelson Report, the Stauffer Report and Stauffer Errata, and the Mitzenmacher Report set forth infringement theories that were not disclosed by Plaintiff as required by the Local Patent Rules.   The Court must accordingly decide the appropriate remedy for Plaintiff's failure to appropriately and timely disclose its infringement theories.  As previously explained:

> Because patent local rules "are essentially a series of case management orders," a district court "may impose any 'just' sanction for the failure to obey" them, including "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence."

*Phigenix*, 783 F. App'x at 1016 (quoting *O2 Micro*, 467 F.3d at 1363); *see also* Fed. R. Civ. P. 37.

Here, Defendant asks the Court to strike the affected portions of Plaintiff's expert reports.   Plaintiff, on the other hand, argues that the "extreme sanction of excluding evidence of infringement" is not warranted, and that the Court should consider lesser sanctions such as allowing "limited supplemental expert reports and corresponding

- 45 -

narrowed discovery." (Dkt. 253 at 15).  Having considered the matter carefully, the Court finds that striking the portions of Plaintiff's expert reports that refer to previously undisclosed infringement theories is warranted.

As an initial matter, the Court notes that Plaintiff cites to and relies upon the Second Circuit's decision in *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) in opposing Defendant's Motion to Strike.  (*See* Dkt. 253 at 13).  However, the Court's interpretation and application of its Local Patent Rules is governed by Federal Circuit law where those rules "are likely to directly affect the substantive patent law theories that may be presented at trial." *O2 Micro*, 467 F.3d at 1364.[11]  That is plainly the case here, and so the Court applies the law of the Federal Circuit.  *See id.*  (local patent rules that are "designed specifically to require parties to crystallize their theories of the case early in the litigation" satisfy the relevant criteria (quotation omitted)).

In *O2 Micro*, the Federal Circuit upheld the validity of local patent rules "requiring the early disclosure of infringement and invalidity contentions and requiring amendments to contentions to be filed with diligence." *Id*. at 1366.  The *O2 Micro* court further held that local patent rules allowing amendment of infringement contentions for "'good cause' require[] a showing of diligence." *Id*.  In *Phigenix*, the Federal Circuit relied on that holding to find that a district court appropriately exercised its discretion in striking an expert infringement opinion that changed the scope of its infringement allegations based

---

[11]     Plaintiff was on notice of this well-established legal proposition, which Judge Payson cited in her decision on the motion for leave to amend.  (*See* Dkt. 213 at 8).

solely on a lack of diligence.  783 F. App'x at 1020.  The Federal Circuit further noted that

"the exclusion of evidence is often an appropriate sanction for a party's failure to comply

with the patent local rules."  *Id.*; *see also O2 Micro*, 467 F.3d at 1369 ("While there may

be circumstances in which the exclusion of evidence as a sanction for the failure to comply

with a case management order would be an abuse of discretion, . . . this court [has]

concluded that the exclusion of evidence is often an appropriate sanction for the failure to

comply with such deadlines.").

This Court's Local Patent Rules require a showing of good cause in order to allow

for amendment of final infringement contentions.  *See* L. Pat. R. 3.10.  Accordingly, despite

Plaintiff's emphasis on the issue of prejudice, the first and most important question is

whether it has acted with diligence.  The Court easily concludes that it has not.  As noted

above, Judge Payson has already made such a finding with respect to several of the

undisclosed infringement theories, and the Court agrees with her conclusion.  As to the

others, Plaintiff has offered no explanation whatsoever as to why it failed to timely disclose

these theories.  Plaintiff's lack of diligence strongly supports the conclusion that striking

is warranted.

Further, Plaintiff's contention that Defendant will not be prejudiced if Plaintiff is

allowed to pursue these undisclosed infringement theories lacks merit.  As Defendant notes

in its moving papers, it reasonably relied on Plaintiff's Final Infringement Contentions in

developing its own non-infringement and invalidity positions.  (*See* Dkt. 237-1 at 18).

Defendant has articulated several specific ways in which it has been prejudiced, including: (1) it did not develop the factual record relating to the vitiation, ensnarement, or non-equivalence of the claim limitations as to which Plaintiff has newly asserted doctrine of equivalents infringement theories; (2) its invalidity expert relied extensively on Plaintiff's interpretation of the claim limitations as set forth in the Final Infringement Contentions; and (3) it has narrowed its invalidity positions with reference to the infringement theories disclosed in the Final Infringement Contentions. (*Id*. at 19).  While Plaintiff characterizes these assertions as conclusory (*see* Dkt. 253 at 14), the Court disagrees.  Defendant has identified specific paragraphs of its invalidity expert's report that relied on the information contained in the Final Infringement Contentions, as well as specific occasions on which it narrowed its invalidity positions in reliance thereon.  (*See* Dkt. 237-1 at 19).

Moreover, while Plaintiff contends that it will suffer significant prejudice if the newly disclosed infringement theories are stricken (*see* Dkt. 253 at 15), it ignores the fact that this prejudice is entirely of its own making.  Plaintiff chose not to comply with the Local Patent Rules.  It has proffered no reason why the infringement theories detailed in its expert reports could not have been included in its Final Infringement Contentions or why it could not have diligently sought leave to amend its Final Infringement Contentions.

Finally, the Court is not persuaded that reopening discovery is an appropriate alternative remedy.  As Judge Payson explained more than a year ago, the introduction of "new theories of infringement at this stage of the litigation would only further complicate

and protract this complex case." (Dkt. 213 at 26). Tremendous resources have been invested into this litigation by the parties, the Special Master, and the Court, which included crafting the scheduling/case narrowing orders that "narrow[ed] the litigation to a manageable size." (*Id.*). To unwind significant portions of those efforts to allow Plaintiff to assert new infringement theories that it could and should have articulated at the appropriate time is not warranted, particularly in light of the fact that this action was commenced nearly five years ago.

For all these reasons, the Court grants Defendant's motion to strike as to the following: Issues 1-3[12] and 5 as to the '582 Patent; all issues as to the '415 Patent; the sole issue as to the '3005 Patent; the sole issue as to the '255 Patent; all issues as to the '285 Patent; Issues 3-4 and 6-7 as to the '314 Patent; Issues 3-4 and 9 as to the '974 Patent; and Issues 4-8 as to the '9005 Patent. (*See* Dkt. 237-9).

## 2. <u>Damages Opinion</u>

Defendant also asks the Court to exclude certain portions of the second supplemental expert report of David Drews, CLP dated October 4, 2021 (the "Drews Report") (Dkt. 280-7). Defendant argues that: (1) Mr. Drews did not limit the royalty base to the "smallest salable patent-practicing unit" ("SSPPU") for the Workflow Patents[13];

---

[12]    The Court has again utilized Defendant's numbering, as set forth in Dkt. 237-9, for ease of reference.

[13]    The parties refer to the '314, '974, and '9005 Patents as the "Workflow Patents." (*See* Dkt. 213 at 4 n.4).

(2) Mr. Drews did not limit the royalty base to the SSPPU for the '3005 Patent; (3) Mr. Drews inflated the royalty base for the Pentachrome Patents[14] by including sales of Xerox iGen5 printers that are not accused of infringement by Plaintiff's infringement expert; (4) Mr. Drews failed to apportion damages consistent with Federal Circuit law; (5) Mr. Drews inflated the royalty base by including sales outside of the damages period; and (6) Mr. Drews has otherwise inflated the royalty base for the Workflow Patents. (Dkt. 237-1 at 21-33).

Here, for reasons discussed at length below, the Court has determined that Defendant is entitled to summary judgment in its favor on all claims that remain pending in this case. Having resolved the matter at the liability phase, any issues of damages have been rendered moot. Accordingly, the Court need not and does not resolve this aspect of Defendant's Motion to Strike and therefore denies it as moot.

### C. Plaintiff's Motion to Strike

Plaintiff's Motion to Strike asks the Court to: (1) strike portions of the opinion of Defendant's invalidity expert Dr. Gerald Murch; (2) strike portions of the opinion of Defendant's non-infringement expert Dr. Charles Reinholtz; and (3) strike portions of the opinion of Defendant's damages expert Stephen Dell. (Dkt. 238-1). The Court considers each of these requests below.

---

[14]     The parties refer to the '582 and '415 Patents as the "Pentachrome Patents." (*See* Dkt. 180 at 1).

1.      **Dr. Murch's Opinion**

Plaintiff seeks to strike eight paragraphs from the expert report of Gerald M. Murch, Ph.D., dated June 2, 2021 (the "Murch Report") (Dkt. 284) regarding a software product known as Document Scan & Makeready (the "DSM Software").  (Dkt. 238-1 at 3, 9). Plaintiff contends that Defendant failed to disclose the DSM Software as prior art in accordance with the Local Patent Rules, thereby "depriving [Plaintiff of] the opportunity to obtain fact discovery concerning this product[.]"  (*Id.*).  Plaintiff's argument relies on Local Patent Rule 3.3(b), which requires a party opposing a claim of patent infringement on the basis of patent invalidity to serve invalidity contentions in which, among other things, that party identifies "each item of prior art that allegedly anticipates each asserted claim or renders it obvious," "[w]hether each item of prior art anticipates each asserted claim or renders it obvious," and, "[i]f obviousness is alleged, an explanation of why the prior art renders the asserted claim obvious[.]"

As an initial matter, Defendant points out that seven of the eight paragraphs of the Murch Report that Plaintiff seeks to strike relate to the '756 Patent, as to which Plaintiff no longer asserts any claims.  (*See* Dkt. 252 at 8-9).  The Court agrees with Defendant that the removal of the '756 Patent from this action moots Plaintiff's Motion to Strike with respect to these seven paragraphs, and Plaintiff confirmed at oral argument that it did not dispute this conclusion.

The remaining paragraph of the Murch Report at issue is paragraph 171, which is part of a discussion of two pieces of prior art referred to as the "DTSM User Guide " and the "DSM User Guide."  (Dkt. 284 at ¶¶ 168, 171).  Dr. Murch explains in paragraph 171 of the Murch Report that he inspected the DSM Software, reviewed the screens that it displayed to users, and "confirmed that those screens corresponded to the Figures that [he cites] . . . in the DSM User Guide."  (*Id*. at ¶ 171).  Dr. Murch further explains that those specific screens and the DSM Software particularly "are part of the information that a [person of ordinary skill in the art] would have had along with the DSM User Guide," and that accordingly, "where helpful to understanding how a [person of ordinary skill in the art] would have understood the disclosure in the DSM User Guide," he relies on information from his inspection of the DSM Software.  (*Id*.).

Defendant contends that Dr. Murch does not rely on the DSM Software as prior art, but instead as background material, which is permissible.  (*See* Dkt. 252 at 9-10).  The Court agrees.  *See, e.g., Brit. Telecommunications PLC v. IAC/InterActiveCorp*, No. CV 18-366-WCB, 2020 WL 3047989, at *6 (D. Del. June 8, 2020) (collecting cases and explaining that "courts have frequently declined to strike undisclosed [prior art] references . . . from expert reports, when those references are used only as 'background' material").  Dr. Murch confirmed at his deposition that his invalidity opinions do not rely on the DSM Software itself.  (*See* Dkt. 252 at 9).

In reply, Plaintiff contends that it is "improper" for Dr. Murch to use the DSM Software as background in his anticipation analysis "because anticipation is limited to the four corners of the DSM User Guide as a matter of law." (Dkt. 263 at 5). However, this argument was not raised in Plaintiff's opening brief, and the Court will not strike paragraph 171 of the Murch Report on this basis.

### 2.   Dr. Reinholtz's Opinions

Plaintiff next asks the Court to strike from the Expert Rebuttal Report of Charles F. Reinholtz, Ph.D., dated August 2, 2021 (the "Reinholtz Report") (Dkt. 280-8), 16 paragraphs regarding prosecution history estoppel. (Dkt. 238-1 at 9-10). Plaintiff argues that Defendant did not properly disclose its prosecution history estoppel arguments in accordance with the Local Patent Rules. (*Id.* at 10). More particular, Plaintiff notes that Local Patent Rule 3.3(a)(i) required service of a chart responsive to Plaintiff's Final Infringement Contentions in which Defendant identified "as to each limitation in each asserted claim disclosed in [Plaintiff's] claim chart . . . whether such element is present literally or under the doctrine of equivalents in each Accused Instrumentality and, if not, the reason for such denial and the relevant distinctions." Plaintiff further argues that even if Dr. Reinholtz's prosecution history estoppel opinions were properly disclosed, they should be excluded under *Daubert* "because they are completely conclusory and devoid of any analysis explaining how statements made during prosecution of the Asserted Patents surrendered claim scope." (Dkt. 238-1 at 12).

At oral argument, Plaintiff conceded that certain of the contested paragraphs of the Reinholtz Report deal with patents that are no longer asserted in this action.   Moreover, and in any event, the Court has not relied upon any of the disputed paragraphs of the Reinholtz Report in its analysis of the parties' summary judgment motions, and the Court's resolution thereof disposes of this case.   Accordingly, the Court need not and does not reach the merits of Plaintiff's challenge, and instead denies this portion of Plaintiff's Motion to Strike as moot.

### 3.    **Damages Opinion**

Finally, Plaintiff asks the Court to strike the opinions of Defendant's damages expert, Stephen Dell, "because they are not based on sufficient data or facts, nor are they the product of reliable principles and methods."  (Dkt. 238-1 at 13).  More particularly, Plaintiff argues that Mr. Dell has improperly excluded the following revenues from the royalty base: "(a) revenues of products that MASA has specifically accused of infringement; (b) unidentified revenues purportedly associated with accessories to the accused products when the information relied clearly relates to the accused products themselves; (c) revenues by XBS (a Xerox affiliated company) that sells the accused products; and (d) revenues of the accused products through the life of the asserted patents." (*Id*. at 14).  Plaintiff further argues that Mr. Dell has improperly lowered his benchmark royalty rate "based on incomparable license agreements and speculative, unsupported assumptions," that he "improperly applies a royalty cap that is contrary to law and not tied

to the facts of the hypothetical negotiation," and that he "applies an unsupported discount rate to the reasonable royalty, and erroneously applies it back to the date of the hypothetical negotiation instead of when damages purportedly begin." (*Id*.).

As the Court has noted, its determination that Defendant is entitled to summary judgment on the claims that remain in this action obviates any need for a ruling on the parties' damages arguments. Accordingly, the Court denies this aspect of Plaintiff's Motion to Strike as moot.

## II.   **Plaintiff's Validity Motion and Defendant's Invalidity Motion**

### A.   **Legal Standard**

"Summary judgment is appropriate when, based on the record, no genuine issue exists as to any material fact, and the moving party is entitled to judgment as a matter of law." *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (citing Fed. R. Civ. P. 56(c)). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmoving party and resolves all doubts in its favor." *Eli Lilly*, 251 F.3d at 962.

Patents enjoy a statutory presumption of validity. *See* 35 U.S.C. § 282(a) ("A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or

multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.  The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.").  This presumption can be overcome only by clear and convincing evidence.  *See Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011); *Sciele Pharma Inc. v. Lupin Ltd.,* 684 F.3d 1253, 1260 (Fed. Cir. 2012).

> Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise.  Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent.

*Eli Lilly*, 251 F.3d at 962.

### B.   **Plaintiff's Validity Motion**

Plaintiff seeks summary judgment of validity as to: (1) claim 1 of the '3005 Patent; and (2) claims 1 and 14 of the '285 Patent.  (Dkt. 242-1).  The Court considers the first of these issues below.  However, the second of these issues is intertwined with arguments made in Defendant's Invalidity Motion.  (*See* Dkt. 243-1 at 9-12 (arguing that the '285 Patent is invalid)).   Accordingly, for the sake of efficiency, the Court has considered that aspect of Plaintiff's Validity Motion in connection with its consideration of Defendant's Invalidity Motion.

Claim 1 of the '3005 Patent is set forth in section I.B.1.c, *supra*. Plaintiff refers to the '3005 Patent as a "Mechanical Component Patent," and explains that it "generally relates to improving the mechanical workings of printers such as a sheet feeder for engaging and removing a sheet of paper or other material from a stack and feeding it along a path or alignment of electrographic printing engines in a plurality of different print assemblies." (Dkt. 242-1 at 6). Plaintiff contends that it is entitled to summary judgment of validity on claim 1 of the '3005 Patent because: (1) the Patent Trial and Appeal Board ("PTAB") has rejected Defendant's invalidity arguments under its lower "reasonable likelihood of success" standard; and (2) Defendant has failed to provide any argument, opinion, or evidence, that the claim element "wherein said first guide plate is supported at least in part by . . . said shaft" are met by the prior art it has identified or to put forth any evidence to support its contention that the '3005 Patent is obvious. (*Id*. at 7-13).

With respect to the first of these arguments, on December 13, 2018, Defendant filed a petition for *inter partes* review ("IPR") with the PTAB, asserting that claims 1-9 and 14 of the '3005 Patent are anticipated by Japanese Patent Application No. 05-8882 to Suzuki *et al.* ("Suzuki 882"). (Dkt. 242-3 at ¶ 13; Dkt. 258-1 at ¶ 13). Plaintiff filed a preliminary response arguing that the PTAB should deny Defendant's IPR petition because Defendant failed to demonstrate a reasonable likelihood that the challenged claims of the '3005 Patent were unpatentable in light of Suzuki 882. (Dkt. 242-3 at ¶ 14; Dkt. 258-1 at ¶ 14). On June 28, 2019, the PTAB issued a decision concluding that "the information presented in

the [IPR] Petition fails to establish a reasonable likelihood that [Defendant] will prevail in showing the unpatentability of claims 1–14" and accordingly declining to institute IPR and denying the petition.  (Dkt. 242-8 at 3, 18).

Plaintiff contends that Dr. Murch's opinion that Suzuki 882 anticipates claim 1 of the '3005 Patent is the same argument that was made before and rejected by the PTAB. (Dkt. 242-1 at 8).  According to Plaintiff, the rejection of this argument by "a panel of three Administrative Patent Judges . . . with technical degrees and experience" applying a lower standard of evidence establishes that Defendant "cannot prevail under the much higher 'clear and convincing' standard that it must prove to establish validity in this Court."  (Dkt. 242-1 at 11-12).  Defendant does not dispute that it made the same arguments before the PTAB, but argues that instead that: (1) the PTAB's decision was non-precedential; and (2) Plaintiff has changed its own positions regarding the scope of claim 1 of the '3005 Patent with respect to infringement, and this change in position is inconsistent with the position it took before the PTAB.  (Dkt. 258 at 11-18).

Plaintiff's contention that the mere fact of the PTAB's denial of the IPR petition makes summary judgment appropriate is not supported by law.  While "it may be harder to meet the clear and convincing burden when [an] invalidity contention is based upon the same argument on the same reference that the [Patent and Trademark Office] already considered," *Sciele*, 684 F.3d at 1260, the PTAB's decision to dismiss a petition for IPR is statutorily not entitled to preclusive effect before this Court.  *See* 35 U.S.C. §§  315(e)(2),

318(a); *see also Evolved Wireless, LLC v. Apple, Inc.,* No. CV 15-542-JFB-SRF, 2019 WL 831112, at *5 (D. Del. Feb. 21, 2019) ("The Court finds no authority for Evolved's proposition that the PTAB's decision on Apple's IPR petition means that Apple cannot attempt to prove to the trier of fact in this case by clear and convincing evidence that a combination of prior art invalidates the '373 Patent.").   Indeed, in a similar context, the Federal Circuit has held that "a reexamination confirming patentability of a patent claim alone is not determinative of whether a genuine issue of fact precludes summary judgment of no invalidity."  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1341 (Fed. Cir. 2018) (further explaining that "[h]olding otherwise would improperly give complete deference and preclusive effect to the [Patent and Trademark Office's] patentability determination, foreclosing challenges to patent validity in district court based on the same prior art").   This is true despite the fact that a lower, preponderance of the evidence standard applies in reexamination proceedings.  *See In re Baxter Int'l, Inc.,* 678 F.3d 1357, 1364 (Fed. Cir. 2012).

*Procter & Gamble Co. v. Team Techs., Inc.*, No. 1:12-CV-552, 2014 WL 12656554, (S.D. Ohio July 3, 2014), upon which Plaintiff relies (*see* Dkt. 242-1 at 12; Dkt. 261 at 6), is not to the contrary.   In *Procter & Gamble*, the court did not rely on the PTAB's decision alone, but only as "further evidence" after conducting its own independent assessment of the record.  *Id*. at *6-10.  The *Procter & Gamble* court did not simply defer to the PTAB, as Plaintiff urges the Court to do here.  (*See* Dkt. 242-1 at 11-12 ("[The PTAB] determined

that the arguments found in Xerox's IPR Petition and Dr. Murch's expert report did not have a reasonable likelihood of demonstrating that the '3005 Patent was invalid based Suzuki 882.  As a result, Xerox cannot prevail under the much higher clear and convincing standard that it must prove to establish validity in this Court."  (internal citations and quotation marks omitted)).

To be clear, the PTAB's decision is certainly evidence that the Court can consider in determining whether a reasonable trier of fact could invalidate claim 1 of the '3005 Patent.  But it does not, standing alone, warrant a grant of summary judgment of validity in Plaintiff's favor.  The Court accordingly need not reach, at this stage of its analysis, Defendant's alternative argument that Plaintiff's infringement arguments are inconsistent with the position it took before the PTAB.[15]

Plaintiff's contention that "Xerox and Dr. Murch failed to provide any argument, opinion, or evidence that one of the elements of Claim 1 [of the '3005 Patent] is met by Suzuki 882"  (Dkt. 242-1 at 12) presents a closer call.  As noted above, Plaintiff argues specifically that Dr. Murch fails to say anything about whether Suzuki 882 satisfies the claim element "wherein said first guide plate is supported at least in part by . . . said shaft." (*Id.*).  Defendant counters that Dr. Murch did address this limitation, because he noted that "the guide plate is 'mounted to' (i.e., supported by) shaft 37."  (Dkt. 258 at 18; *see also* Dkt. 242-5 at 11).  Plaintiff argues in reply that claim 1 of the '3005 Patent "recites two

---

[15]     The Court does consider this issue below, in connection with Defendant's Non-Infringement Motion.

separate and distinct elements: 'mounted to' and 'supported at least in part by,'" and that "mounted to" and "supported by" do not mean the same thing in this context.  (Dkt. 261 at 8-9).

In order to prove invalidity by anticipation—as Defendant attempts to do here—a party must demonstrate by clear and convincing evidence "that the four corners of a single, prior art document describe <u>every element</u> of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (emphasis added).  Because "[e]vidence of invalidity must be clear as well as convincing," the general rule is that "testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference."  *Schumer v. Lab'y Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).

The Court finds some merit in Plaintiff's argument that Defendant has not satisfied this standard here.  However, the Court need not finally resolve this issue (or Plaintiff's related argument about the evidence supporting a claim of obviousness), because it concludes—for reasons discussed at length below—that Defendant is in any event entitled to summary judgment of non-infringement as to  Claim 1 of the '3005 Patent.  *See Phonometrics, Inc. v. Northern Telecom Inc*., 133 F.3d 1459, 1468 (Fed. Cir. 1998) (if

"noninfringement is clear and invalidity is not plainly evident, it is appropriate to treat only the infringement issue" (citation omitted)).  Accordingly, the Court denies this aspect of Plaintiff's Validity Motion as moot.

### C.   **Defendant's Invalidity Motion**

Defendant seeks summary judgment of invalidity as to the asserted claims of the '9005, '285, and '314 Patents on the basis that they are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and as to the asserted claim of the '255 Patent on the basis of anticipation.  (Dkt. 243-1).  Defendant further seeks a ruling that the Pentachrome Patents (that is, the '582 and '415 Patents) are unenforceable for the period of time between December 9, 2016, and April 18, 2019.  (*Id*.).

### 1.   **Patent Eligibility Under 35 U.S.C. § 101 (the '9005, '285, and '314 Patents)**

Under the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, composition of matter, or any new and useful improvement thereof" is able to obtain a patent.  35 U.S.C. § 101.  The Supreme Court has held that there is "an important implicit exception" in § 101—namely, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted).

Courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Id*. at 217.  Accordingly, "an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Id*.  Instead, the Court must

"distinguish between claims to patent ineligible subject matter and those that 'integrate the building blocks into something more.'"   *Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1342 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 217).

The Court employs a two-part test under *Alice* in assessing patent eligibility under § 101.   *See Alice*, 573 U.S. at 217.   First, the Court "determine[s] whether the claims at issue are directed to a patent ineligible concept."   *Nat. Alternatives*, 918 F.3d at 1342 (quotation omitted).   Second, if the Court "determine[s] that the claims are directed to a patent ineligible concept, [it] consider[s] the elements of each claim both individually and as an ordered combination to determine whether additional elements transform the nature of the claim' into a patent-eligible application,  i.e., whether there is an inventive concept."   *Id*.  (quotation omitted).   "Patent eligibility under § 101 is an issue of law that sometimes contains underlying issues of fact."   *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1181 (Fed. Cir. 2020).

### a.   <u>The '9005 Patent (Claim 1)</u>

The '9005 Patent relates to a "method and system of pre-selecting ordered media in a printing system."  (Dkt. 243-2 at ¶ 1; Dkt. 254-2 at ¶ 1).  The specification of the '9005 Patent explains that "[w]hen using ordered media within a print job, there may be instances where it is necessary to separate or dispose of unused portions or sheets of the ordered media" and that "[i]n order to address the deficiencies of the prior art, an improved method

and system are provided for pre-selecting only that portion of the ordered media that will be used in the print job." (Dkt. 243-2 at ¶ 2; Dkt. 254-2 at 1).

Defendant contends that the '9005 Patent is directed to patent-ineligible subject matter because it claims "the abstract idea of sorting unwanted ordered media *before*, rather than *during*, a print job" and that idea is not an inventive concept sufficient to confer patent eligibility. (Dkt. 243-1 at 17, 19-20 (emphasis in original)). Plaintiff argues in opposition that the '9005 patent "is directed to a specific improvement in digital printing technology which is patent eligible"—namely, "pre-selecting only that portion of the ordered media that will be used in the print job." (Dkt. 254 at 7 (alteration and citation omitted)).

At the first *Alice* step, the Court must be careful not to "generalize[] the claims such that [its] characterization of the alleged abstract idea [is] 'untethered from the language of the claims.'" *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)). The Federal Circuit has acknowledged that it is "difficult at times to determine what the correct level of abstraction is to characterize the claims," and has advised that a court should attempt to "capture[] what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *Id.* (quoting *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)).

Here, having carefully examined the language of the '9005 Patent itself, the Court agrees with Defendant that it is directed to an abstract idea—namely, the abstract idea of

sorting out unwanted ordered media before, rather than during, a print job.  The language of the '9005 Patent confirms this conclusion, explaining that there was a need within digital printing systems to "pre-select only that portion of the ordered media that will be used in the print job," because "[s]eparating the unused portions of the ordered media during the print job may slow down the completion of the print job" and "lead to inefficient use of the printer when the print shop has many print jobs to run on the printer."  (Dkt. 247-27 at 16). It goes on to explain that it is the pre-selection of a portion of the ordered media that "address[es] the deficiencies of the prior art," because it means that "the unused portion of the ordered media is not present when the print job is run, leading to a faster and more efficient processing of the print job on the printer."  (*Id*.).

In other words, the problem addressed by the '9005 Patent is the inefficiency inherent in sorting the wanted portion of the ordered media from the unwanted portion, and the improvement over the prior art is that the sorting occurs prior to the print job being run, which allows the print job to process more quickly.  However, general concepts about how to "make a process more efficient . . . do[] not necessarily render an abstract idea less abstract."  *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017); *see also Solutran*, 931 F.3d at 1167 ("The desire to credit a merchant's account as soon as possible is an equally long-standing commercial practice. . . .  The only advance recited in the asserted claims is . . . crediting the merchant's account before the paper check is scanned.  We conclude that this is an abstract idea.").

Further, the fact that the '9005 Patent describes the use of computer elements to pre-select which unwanted media to purge (as opposed to doing so through a manual process) does not render its subject matter patent eligible.  The Federal Circuit has repeatedly held that "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment[.]"  *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015); *see also Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[S]imply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) ("[I]mproving a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality.").

Plaintiff's arguments to the contrary are not persuasive.  Plaintiff contends that claim 1 of the '9005 Patent "does not use the digital printing system merely as a tool," but instead "requires many non-generic digital printing system components."  (Dkt. 254 at 8 (quotation omitted)).  As an initial matter, merely having "additional limitations" that "add a degree of particularity" to a claim does not mean that the "concept embodied by the majority of the limitations" does not "describe[] only [an] abstract idea[.]"  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014).  Moreover, Plaintiff offers no plausible argument that the components "input source," "user interface having an input

- 66 -

device," "first job output," "second job output," and "central processing unit" are anything other than conventional.  As to "input source," the Court has construed this to simply mean "[a] physical container configured to hold or receive physical media."  (Dkt. 185-1 at 21). The Court has also construed "a user interface having an input device" to mean "[a] user interface in communication with a physical device with which a user may make inputs." (*Id*.).  The "job output" is simply the part of the printer where the media is routed after processing, such as a paper tray (*see* Dkt. 247-27 at 16), and a central processing unit is "the computational and control unit of a computer."  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1238 (Fed. Cir. 2016) (quoting Microsoft Computer Dictionary, 115 (4th Ed. 1999)).  Defendant has presented expert testimony from Dr. Murch that all these items were in conventional use in printers well before the priority date of the '9005 Patent.  (*See* Dkt. 243-3 at ¶¶ 15-16, 19-20).

In opposition, Plaintiff cites to opinions from its expert witness Michael T. Goodrich, Ph.D., that it claims demonstrate that the prior art did not "teach or suggest" these claim limitations "in the context of Claim 1 of the '9005 Patent." (*See* Dkt. 254-2 at ¶¶ 18-21).  However, the portions of Dr. Goodrich's opinion cited by Plaintiff discuss a single piece of prior art (namely U.S. Patent No. 5,133,048 (the "'048 Patent")) and do not address the pertinent issue: whether these individual components were conventional prior to the earliest possible priority date of the '9005 Patent.  (*See* Dkt. 247-71 at ¶¶ 531-56). For example, Plaintiff cites paragraphs 531 to 534 of Dr. Goodrich's opinion as support for

its statement that "MASA, through its expert Dr. Goodrich, presented evidence that the prior art does not teach or suggest 'an input source to store at least one set of ordered media,' in the context of Claim 1 of the '9005 Patent." (Dkt. 254-2 at ¶ 18). However, these paragraphs of Dr. Goodrich's opinion conclude only that the '048 Patent "does not disclose all of the requirements for 'the ordered media' as required by claim 1" of the '9005 Patent. (Dkt. 247-71 at ¶ 533). Dr. Goodrich's assessment of what the '048 Patent discloses regarding "the ordered media" does not rebut Dr. Murch's expert opinion that "[p]rinters have had . . . physical containers [configured to hold or receive physical media] since printers were invented" and that "[p]rinters with compartments to store physical media have long preexisted the priority date of the '9005 Patent." (Dkt. 243-3 at ¶ 15).

Accordingly, on the record before the Court, it is uncontradicted that these components were known at the relevant time period, and there is accordingly no material dispute of fact. *Cf. Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."). In other words, claim 1 of '9005 Patent is "directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery rather than a specific means or method that improves the relevant technology." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (quotations and alteration omitted), *cert. denied*, __ U.S. __, 142 S. Ct. 1113 (2022).

Plaintiff also cannot support its claim that the '9005 Patent "help[s] the printer sort faster, or in a unique or innovative way." (Dkt. 254 at 9 (citation omitted)). Plaintiff cites to the statement in the specification of the '9005 Patent that it "lead[s] to a faster and more efficient processing of the print job on the printer." (*Id.* (alteration in original and citation omitted)). However, in context it is clear that the reason that the method described in the '9005 Patent leads to increased efficiency is not because it makes a technological change to the printer's functioning, but because it allows the unwanted media to be removed and sent to the purge tray before the print job is processed. In other words, the print job is processed more quickly because less media is processed, which is precisely the same result that would be achieved by manually removing the unwanted media ahead of time.

Dr. Goodrich opines that claim 1 of the '9005 Patent "discloses improvements to printing system functionality itself" because it "recites two job outputs." (Dkt. 247-71 at ¶ 694). However, the '9005 Patent itself acknowledges that existing printing systems "support special features that allow two output destinations to be used during a single print job." (Dkt. 247-27 at 16). The use of two job outputs accordingly does not represent a technical innovation. Similarly, Dr. Goodrich opines that claim 1 of the '9005 Patent improves the functionality of printing systems because it (1) allows a user to select which portions of the ordered media to use and (2) uses a paper catalog. (Dkt. 247-71 at ¶ 695). Again, the '9005 Patent itself discusses the fact that existing systems have mechanisms by which a user can select portions of the ordered media to discard during the print job. (*See*

Dkt. 247-27 at 16).  As to the use of a paper catalog, the '9005 Patent indicates that a paper catalog is merely "a list . . . [of] every physical stock of media that is available to the user in the print shop and which may be loaded on the printer." (*Id*. at 19).  Further, the '9005 Patent does not describe a method for creating the paper catalog.  Dr. Goodrich offers no plausible explanation for how keeping and referring to a list of available stock constitutes a technical innovation.

Dr. Goodrich then opines that claim 1 of the '9005 Patent "discloses an improvement to the functionality of printing systems that don't allow different portions of ordered stock to be sent to different job outputs based on user pre-selections of the different portions" because it "recites a CPU configured to send the first part of the ordered media set (as pre-selected using the user interface) directly to the first job output and the second part of the ordered media set (also as pre-selected using the user interface) directly to the second job output[.]" (Dkt. 247-71 at ¶ 696).  This is nothing more than a recitation of the abstract idea, implemented by generic technology—that is, using a generic central processing unit to identify which portions of the ordered media should be sent to which job output before the print job is run.

In sum, "[t]he abstract idea at the heart of," *Ultramercial*, 772 F.3d at 714, the '9005 Patent is that identifying and removing unwanted portions of the ordered media ahead of time and during off-peak hours, rather than during the processing of a print job, will make the print job run faster.  The '9005 Patent then recites the use of generic, conventional

technology to implement that abstract idea.  The Court must accordingly ask, at step 2 of the *Alice* analysis, whether asserted claim 1 of the '9005 recites an inventive concept sufficient to confer patent eligibility as to that abstract idea.  It does not.

Considered individually, none of the limitations of claim 1 of the '9005 Patent reveal an inventive concept.  *See Alice*, 573 U.S. at 217 (at step two, the court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application" (internal quotation marks omitted)).  Instead, the individual limitations of this claim describe generic, conventional technology.  While Dr. Goodrich purports to opine to the contrary (*see* Dkt. 247-71 at ¶¶ 709-725), an examination of his opinion reveals that he relies essentially exclusively on his analysis of the '048 Patent in reaching that conclusion.  (*See, e.g., id.* at ¶¶ 715, 718).  Neither Dr. Goodrich nor Plaintiff has offered an argument for how an assessment of a single piece of prior art can reasonably be construed to rebut Dr. Murch's opinion about the conventionality of the relevant limitations.  Further, Dr. Goodrich's opinion incorrectly assumes that if a combination is novel and nonobvious, it necessarily embodies an inventive concept.  (*See, e.g., id.* at ¶ 700).  However, it is not "enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art[.]"  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a new abstract idea is still an abstract idea. The

search for a § 101 inventive concept is thus distinct from demonstrating § 102 novelty.").
For these reasons, Dr. Goodrich's opinion does not create a genuine issue of material fact
regarding the presence of an inventive concept.

Plaintiff also argues that "[c]laim 1 of the '9005 Patent contains an inventive
concept when viewed as an ordered combination." (Dkt. 254 at 12). It is true that "an
inventive concept can be found in the non-conventional and non-generic arrangement of
known, conventional pieces." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329, 1339 (Fed. Cir. 2017). However, "[a]n inventive concept that transforms
the abstract idea into a patent-eligible invention must be significantly more than the abstract
idea itself, and cannot simply be an instruction to implement or apply the abstract idea on
a computer." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341,
1349 (Fed. Cir. 2016). Here, "[e]ven when viewed as a whole," the limitations set forth in
claim 1 of the '9005 Patent do not "improve the functioning of the [printer] itself or effect
an improvement in any other technology or technical field." *Solutran*, 931 F.3d at 1169.
Instead, they merely use conventional technology to implement the abstract idea of
removing the unwanted ordered media before the print job is processed.

Dr. Goodrich contends that a person of ordinary skill in the art "would understand
that the elements of claim 1 of the '9005 Patent are combined to claim an inventive
concept." (Dkt. 247-71 at ¶ 700). However, the sole "example" he gives to support this
assertion describes nothing more than the fact that the central processing unit splits the

ordered media into two portions and sends it to two different job outputs.  (*Id*.).  Again, the "inventive concept" described by Dr. Goodrich is simply a restatement of the abstract idea, which requires that the unwanted ordered media be sent to a different location than the wanted ordered media.  This is not sufficient to establish patent eligibility.  *See Bascom*, 827 F.3d at 1349.

For all these reasons, the Court agrees with Defendant that claim 1 of the '9005 Patent is directed to patent-ineligible subject matter and is accordingly invalid.

**b.     The '285 Patent (Claims 1 and 14)[16]**

The '285 Patent relates to "the operator maintenance of systems having components with predictable lifespans."  (Dkt. 243-2 at ¶ 22; Dkt. 254-2 at ¶ 22).  The specification of the '285 Patent explains that the "[t]he prior art is replete with complicated systems having numerous parts that wear during normal use" and "require periodic maintenance to replace worn components."  (Dkt. 247-68 at 7).  "Typically, these complicated systems require service professionals such as field engineers to repair or replace the components . . . that wear during periods of normal use."  (*Id*.).  However, "the period or time that the system is not working or, working at less than optimum performance, is critical," because for many such systems—including digital printing systems—"it is intended to keep the system running continuously."  (*Id*.).  Accordingly, the '285 Patent recognizes "a need within the

---

[16]     As noted above, Plaintiff has also moved for summary judgment of validity as to claims 1 and 14 of the '285 Patent.  (*See* Dkt. 242-1 at 13-18).  The Court has considered all the parties' arguments in reaching its conclusions.

prior art for a method and apparatus for a system that enables operator maintenance without requiring the aid of field service persons." (*Id*.). The '285 Patent addresses this "by providing a system having Operator Replaceable Component (ORC) devices that have a predictable lifetime before" needing to be replaced and wherein the system "keeps track of the remaining lifetime of the ORD devices and prompt[s] the operator when the ORC devices need to be replaced." (*Id*.).

Defendant argues that asserted claims 1 and 14 of the '285 Patent "are directed to the abstract idea of collecting and analyzing information related to a component's lifespan and notifying the user when that component needs to be replaced" (Dkt. 243-1 at 21). Plaintiff, on the other hand, argues that these claims are "are directed to specific, tangible components which are concrete solutions to problems and operate together to effect improvements to digital printing systems, including: a 'use mechanism' that tracks, a 'comparison mechanism' that compares, and an 'operator alert mechanism' that notifies." (Dkt. 242-1 at 14).

The Court agrees with Defendant that asserted claim 14 of the '285 Patent is directed to an abstract idea. Claim 14 describes a method wherein the lifespan of ORC devices is tracked and compared to a predetermined threshold and the operator is notified if the predetermined threshold is exceeded. (*See* Dkt. 155-21 at 14). The Federal Circuit has explained that where the focus of a claim is "collecting information, analyzing it, and displaying certain results of the collection and analysis," it "fall[s] into a familiar class of

claims 'directed to' a patent-ineligible concept." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (further explaining that claims are directed to an abstract idea where "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions"). That is precisely the case here—the steps in claim 14 involve tracking the life span of the ORC devices (collecting information), comparing the remaining life to a pre-determined threshold (analyzing information), and notifying the operator if the pre-determined threshold has been exceeded (displaying the results of the collection and analysis).

Claim 14 also, as Defendant correctly points out (*see* Dkt. 258 at 24), describes a "mental process[] that can be performed in the human mind or using a pencil and paper— a telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (quotations and citations omitted). Defendant provides a useful example: "a human could: (1) look up the expected lifespan of a device component in a manual; (2) keep track of how often the device is used; and (3) notify the office manager when the component is nearing the end of its expected lifespan." (Dkt. 258 at 24). Plaintiff's contention that "[a]n operator cannot reasonably calculate how many pages have been printed for every component in the printer and then obtain a remaining life . . . [n]or would an operator be able to approximate the life of components, such as drums, where expected life could be measured in terms of rotations" (Dkt. 261 at 11) misses the point. Nothing

in claim 14 is addressed to these specific scenarios. "[T]he § 101 inquiry must focus on the language of the Asserted Claims themselves[.]" *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (citation omitted).

As to claim 1, it merely couples the abstract idea embodied in claim 14 to the generic components of a "use mechanism," a "comparison mechanism," and "an operator alert mechanism."[17] The patentee does not claim to have invented any of these mechanisms, and a claim that is "directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery" is not patent-eligible. *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017) (citation omitted).

The Court accordingly proceeds to step 2 of the *Alice* analysis and considers whether the asserted claims of the '285 Patent contain inventive concepts when considering their elements individually and as an ordered combination. Plaintiff argues that "when considered on an individual basis, each of the components/methods that correspond to the elements of the asserted claims are not generic or conventional because they each possess a novel way to interface and communicate data about the ORCs within a printer." (Dkt.

---

[17]    At the claim construction phase, this Court found that "use mechanism" and "comparison mechanism" were means-plus-function limitations with corresponding structure. (Dkt. 185 at 53-54). However, "this is not enough for the system to become patent-eligible subject matter." *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 414 (D.N.J. 2015) (finding claim was directed to abstract idea despite containing a means-plus-function term that included the physical structures for carrying out the function of recording information), *aff'd*, 636 F. App'x 1014 (Fed. Cir. 2016).

242-1 at 17).  However, the expert opinion Plaintiff relies on in support of this contention considers features that are taken from the specification of the '285 Patent and found nowhere in claims 1 or 14.  Specifically, Plaintiff's expert, John Bassani, Ph.D., opines that "[t]he components that correspond to the claim elements of Claim 1 are not generic or conventional because they each possess a novel way to interface and communicate data about the ORCs within a printer.  For example, each ORC could have its own page counter, a rotation counter, a toner density sensor, etc. for the purpose of providing raw usage data or counts of that ORC to a CPU in order to translate the raw usage data to a metric that can compare to the total expected life of each individual ORC[.]"  (Dkt. 242-12 at ¶ 143).  However, claim 1 of the '285 Patent does not identify any of these hardware components as part of the claimed system.  As the Court has already explained, "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves," *Synopsys*, 839 F.3d at 1149, and "[e]ven a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea." *ChargePoint, Inc.*, 920 F.3d at 769.

Plaintiff also argues that "[w]hen considering the claim elements collectively, as an ordered combination, the various components of Claim 1 include a use mechanism, a comparison mechanism, and an operator alert mechanism, while Claim 14 has corresponding methods for each of these mechanisms" and that "[s]uch a combination of

these claim limitations did not exist in the prior art and form the inventive concept, rendering the claims patent eligible." (Dkt. 242-1 at 18). As noted above, it is not "enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art[.]" *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018). "[I]nvoking various computer hardware elements . . . does not change the fact that in substance, the claims are still directed to nothing more" than the idea of tracking and displaying information regarding the lifespan of the ORC devices. *Smart Sys. Innovations*, 873 F.3d at 1374.

For all these reasons, the Court finds that Defendant is entitled to summary judgment of invalidity as to claims 1 and 14 of the '285 Patent. Plaintiff's motion for summary judgment of validity as to these claims is denied.

## c.    <u>The '314 Patent (Claims 1 and 51)</u>

The '314 Patent relates to an interface, implemented in a computer, for representing and controlling a production printing workflow. (Dkt. 243-2 at ¶ 47; Dkt. 254-2 at ¶ 47). The '314 Patent explains that "[d]espite the automation provided by the production printer and the proliferation of computer technology, especially in the area of desktop publishing, production printing is still a complicated and often manual process," and that accordingly, "there is a need for an efficient system and method for managing the production printing workflow." (Dkt. 247-11 at 11).

Defendant argues that asserted claims 1 and 51 of the '314 Patent "are directed to the abstract idea of using software to automate previously manual tasks related to print production." (Dkt. 243-1 at 23). Plaintiff contends in opposition that the '314 Patent "is a software-based innovation that is an improvement to computer technology[.]" (Dkt. 254 at 17).

Plaintiff relies primarily on the Federal Circuit's decision in *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018), in support of its argument. In *Finjan*, the patent in question was "directed to a method of providing computer security by scanning a downloadable and attaching the results of that scan to the downloadable itself in the form of a 'security profile.'" (*Id.* at 1303). The Federal Circuit explained that "software-based innovations can make 'non-abstract improvements to computer technology' and be deemed patent-eligible subject matter at step 1." *Id.* at 1304 (quoting *Enfish*, 822 F.3d at 1335-36). The Federal Circuit went on to explain, that because "a result, even an innovative result, is not itself patentable," the key question in this context is whether "the claims recite more than a mere result"—that is, whether the claims set forth "an inventive arrangement for accomplishing the result." *Id.* at 1305.

Here, the Court agrees with Defendant that the asserted claims of the '314 Patent are unlike those at issue in *Finjan*. Specifically, the '314 Patent makes clear that the problem it seeks to solve are the human errors involved in the printing process. (*See, e.g.,* Dkt. 247-11 at 11 ("With such a complicated production process to produce finished

output, errors are bound to occur, such as loading the wrong paper stock in the printer or setting a margin too close to a binding.")).  The "mere automation of manual processes using generic computers . . . does not constitute a patentable improvement in computer technology." *Trading Techs.*, 921 F.3d at 1384.

Further, unlike the claims at issue in *Finjan*, the asserted claims of the '314 Patent do not set forth "a non-abstract improvement in computer functionality." *Finjan*, 879 F.3d at 1299.  As Dr. Murch explains, the asserted claims of the '314 Patent use "conventional object oriented programming to visually represent and associate the previously manual aspects of a print job: the initial document (the 'document object'), the job ticket with the customer's instructions (the 'document ticket object'), and features associated with a particular document page (the 'page object')."  (Dkt. 243-3 at ¶ 54).  Dr. Murch further explains that software with this kind of functionality was well known prior to the '314 Patent.  (*Id.* at ¶¶ 55-65).  Plaintiff cites to nothing to contradict this testimony, and so it is undisputed on the record before the Court.

Accordingly, Plaintiff's contention that the "the '314 Patent innovations . . . employ electronic job tickets that minimizes production error over traditional workflow printing systems that had not been done before" (Dkt. 254 at 18) rings hollow.  Dr. Murch has identified specific "publishing and print job software" in use before May 2000 (the claimed priority date of the '314 Patent) that "included a representation of printing settings that would correspond to a 'job ticket.'"  (Dkt. 243-3 at ¶ 59).  This is fundamentally unlike

*Finjan*, where the claims at issue "employ[ed] a new kind of file that enable[d] a computer security system to do things it could not do before."  879 F.3d at 1305.  The Court accordingly agrees with Defendant that the asserted claims of the '314 Patent are directed to an abstract idea—they recite the use of conventional software to achieve the desired result.

However, the Court agrees with Plaintiff that Defendant has not demonstrated invalidity of the asserted claims of the '314 Patent at *Alice* step two.  Plaintiff explains that the "claimed invention goes beyond merely displaying software objects on a [graphical user interface]—when viewed as an ordered combination, it *associates* the objects with visual representations in a novel way, in turn creating unconventional associations of the underlying objects themselves."  (Dkt. 254 at 21 (emphasis in original)).   Plaintiff has cited to specific testimony by Dr. Goodrich in which he explains that, for example, a person of ordinary skill in the art "would understand that the user input device of claim element 1.E performs an action of selectively associating at least two of said first, second, and third visual representations, and this action is combined in a nonconventional way with the additional limitation of claim element 1.F wherein association of said first, second, and third visual representations results in association of said respective objects."  (Dkt. 247-71 at ¶ 610).  This is a specific alleged inventive concept that—unlike Dr. Goodrich's analysis of claim 1 of the '9005 Patent—does not rely solely on an assertion of novelty and non-obviousness and is not merely a restatement of the abstract idea.  Accordingly, there exists

a genuine, material factual dispute that is not amenable to resolution by the Court on a motion for summary judgment. *See Berkheimer*, 881 F.3d at 1370 ("Whether claims 4-7 perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims."). Defendant's motion for summary judgment of invalidity is accordingly denied as to the '314 Patent.

### 2.   The Pentachrome Patents

The Court turns next to Defendant's contention that the Pentachrome Patents (that is, the 582 and '415 Patents) are unenforceable for the period of time between December 9, 2016, and April 18, 2019. This argument is related to the fact that the Pentachrome Patents are subject to a terminal disclaimer.[18] The Court discussed this issue at length in its Decision and Order entered on August 10, 2020 (Dkt. 180), familiarity with which is assumed.

The Court concludes for reasons discussed at length below that Defendant is entitled to summary judgment of non-infringement as to the Pentachrome Patents. Accordingly, the Court denies this portion of Defendant's Invalidity Motion as moot.

---

[18]   "A 'terminal disclaimer' refers to a procedure by which patent applicants obviate and thereby cure an obviousness-type double patenting rejection by disclaiming any rights in the second application after the expiration date of the original patent. Because the second patent will now expire at the same time as the first one, the concerns that underlie an obviousness-type double patenting rejection are alleviated and the second patent can issue, giving applicants the benefits of having their improvements protected." *Affymetrix, Inc. v. PE Corp.*, No. 01 CIV. 0634 (NRB), 2002 WL 31875401, at *2 n.4 (S.D.N.Y. Dec. 24, 2002) (citation omitted).

### 3.    <u>The '255 Patent (Claim 12)</u>

Defendant's final invalidity argument is that its Phaser 6130 printer product anticipates claim 12 of the '255 Patent under Plaintiff's theory of infringement for Defendant's Phaser 6500 printer product.  (Dkt. 243-1 at 29).  Defendant notes that "[i]t is a well-established axiom in patent law that a product that would 'infringe[], if later, would anticipate, if earlier.'"  (*Id*. (quoting *CommScope Techs. LLC v. Dali Wireless Inc*., 10 F.4th 1289, 1294 (Fed. Cir. 2021))).  Defendant contends that the Phaser 6500 is identical in all relevant respects to its predecessor, the Phaser 6130, and that the Phaser 6130 "which was on sale and in public use prior to June 25, 2009, is prior art to the '255 patent."  (*Id*. at 30).  Thus, according to Defendant, "if the Phaser 6500 infringes claim 12 of the '255 patent, then the Phaser 6130 anticipates it, rendering the claim invalid under 35 U.S.C. § 102."  (*Id*.).

In opposition, Plaintiff argues that Defendant has "failed to provide ***any*** explanation of how the Phaser 6130 satisfies each element of Claim 12, as required to prove anticipation," but has instead relied on Plaintiff's infringement allegations "which are subject to a lower standard of proof."  (Dkt. 245 at 25).  Plaintiff contends that Defendant's "lack of proof" means that there "remain material disputes of fact regarding whether each element of Claim 12 is found in the Phaser 6130, precluding summary judgment."  (*Id*.).

"A determination that a patent is invalid as anticipated under 35 U.S.C. § 102 requires that a prior art reference disclose every limitation of the claimed invention, either

explicitly or inherently." *Liebel-Flarsheim Co. v. Medrad, Inc.,* 481 F.3d 1371, 1381 (Fed. Cir. 2007) (citation omitted). "Whether a claim is anticipated is a question of fact." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 406 (Fed. Cir. 2018).

The Federal Circuit has held that the party claiming invalidity due to anticipation can satisfy its burden on summary judgment by pointing to a party's allegation that a particular product infringes the patent <u>if</u> that same product "was on sale before the critical date." *Kim v. Earthgrains Co.*, 60 F. App'x 270, 272 (Fed. Cir. 2003). This is so because "it would be inconsistent for [a party] to argue that [particular products] fall within the scope of the claims for infringement purposes but not for anticipation purposes." *Id.*; *see also CommScope*, 10 F.4th at 1299. "A patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001) (citation and internal quotation marks omitted). However, it is incumbent on the party seeking summary judgment to demonstrate that the accused products and the products sold before the critical date did not have "materially different compositions." *Kim*, 60 F. App'x at 273-74.

Here, Dr. Murch performed an inspection of a Phaser 6130 from 2007 and its service manual and of a Phaser 6500 and its service manual. (Dkt. 243-3 at ¶¶ 95-96). Dr. Murch further performed an element-by-element assessment of Plaintiff's infringement allegations as to the Phaser 6500's alleged infringement of claim 12 of the '255 Patent and concluded that the Phaser 6130 "[has] identical parts and . . . operate[s] functionally

identically to the Phaser 6500 with respect to the parts identified in MASA's infringement allegations."  (*Id*. at ¶¶ 96-113).

Plaintiff has come forward with nothing to challenge Dr. Murch's expert testimony that the Phaser 6130 and Phaser 6500 are identical in all material respects.  Instead, Plaintiff asserts that Dr. Murch has "provided no evidence" for his conclusions.  (*See* Dkt. 245-2 at ¶¶ 96, 98, 100, 102, 104).  This contention is nonsensical.  The evidence for Dr. Murch's conclusion is his own inspection of the products, which he sets forth in detail.

Plaintiff's other arguments are also unpersuasive because they ignore the basis for Defendant's motion.  Plaintiff argues as though Defendant is making its anticipation argument in a vacuum, complaining that Defendant has not discussed the Court's construction of certain terms found in claim 12 and that Defendant fails to address all of the elements of claim 12.  (Dkt. 254 at 24-25).  However, Dr. Murch's analysis of the Phaser 6130 tracks Plaintiff's infringement contentions as to the Phaser 6500 precisely. Plaintiff fails to acknowledge the case law clearly establishing that its infringement contentions are an appropriate starting point for the anticipation analysis where the products at issue are materially identical.

Plaintiff also faults Dr. Murch for not addressing the portions of the Nelson Report regarding an ADC sensor and mirrors and laser diodes in the Phaser 6500.  (*See id.* at 25).  However, those components of the Phaser 6500 are not mentioned at all in Plaintiff's Final Infringement Contentions—indeed, the Court has already held above that portions of the

Nelson Report raising infringement theories in this regard must be stricken. Accordingly, these components are not relevant to the analysis of whether the Phaser 6130 and the Phaser 6500 are materially identical for purposes of Plaintiff's Final Infringement Contentions.[19]

In sum, on the record before the Court it is uncontroverted that that the Phaser 6130 and the Phaser 6500 have identical components and function identically in all respects material to Plaintiff's claim that the Phaser 6500 infringes claim 12 of the '255 Patent. It is further uncontroverted that the Phaser 6130 is prior art to the '255 Patent. Accordingly, because "that which infringes, if later, would anticipate, if earlier," *CommScope*, 10 F.4th at 1294 (citation and alteration omitted), Defendant is entitled to summary judgment that the Phaser 6130 anticipates claim 12 of the '255 Patent under Plaintiff's theory of infringement for the Phaser 6500. *See Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1339 (Fed. Cir. 2001) ("Because the foam made by AVI would infringe the Park patents if made after the Park invention, it anticipates in fact the relevant claims of the Park patents, since it was made before Park's invention.").

## III.   Defendant's Non-Infringement Motion and Plaintiff's Infringement Motion

### A.   Defendant's Non-Infringement Motion

The Court turns next to Defendant's Non-Infringement Motion. Defendant seeks summary judgment of non-infringement as to every claim asserted by Plaintiff at this stage of the litigation. There are portions of this motion that have been mooted by the Court's

---

[19]   In any event, Defendant has submitted evidence that these components are present in the Phaser 6130. (*See* Dkt. 267-2).

previous rulings.  In particular, Defendant's Non-Infringement Motion has been mooted as to claim 12 of the '255 Patent, claims 1 and 14 of the '285 Patent, and claim 1 of the '9005 Patent as a result of the Court's ruling on Defendant's Invalidity Motion.  It is axiomatic that one cannot infringe an invalid patent claim.  *See Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1580 (Fed. Cir. 1983) ("The claim being invalid there is nothing to be infringed.").

Additionally, Defendant incorporates the arguments made in Defendant's Motion to Strike into Defendant's Non-Infringement Motion, arguing that if the Court grants the relevant portions of its Motion to Strike, Plaintiff cannot meet its burden to show that: (1) the accused software products include a hardware "input device" for claim 1 of the '314 Patent and claim 2 of the '974 Patent; (2) the accused products perform the "selectively associating step" required by claim 51 of the '314 Patent; (3) the accused products perform the "arranging the plurality of the documents," "automatically converting," or "alternate output device" steps required by claim 1 of the '974 Patent; or (4) the accused system has a "use mechanism" or a "comparison mechanism" as required by claim 1 of the '285 Patent. (Dkt. 247-1 at 29).

Defendant's argument as to the '285 Patent is moot because the Court has found claim 1 thereof invalid.  With respect to claim 1 of the '974 Patent, the Court has denied the portions of Defendant's Motion to Strike that it claims would warrant entry of summary judgment.  However, the Court has granted the relevant portions of Defendant's Motion to

Strike with respect to claim 2 of the '974 Patent and claims 1 and 51 of '314 Patent.  As to claim 1 of the '314 Patent and claim 2 of the '974 Patent, the Court agreed with Defendant, for reasons discussed at length above, that Plaintiff's Final Infringement Contentions did not disclose an infringement theory wherein the "input device" consisted of hardware and that Plaintiff would not be permitted to introduce this previously undisclosed infringement theory through the Mitzenmacher Report.

Similarly, as to claim 51 of the '314 Patent, the Court struck the portion of the Mitzenmacher Report opining that the "selectively associating" limitation is met by using an input device to edit an object in one view of FreeFlow Express to Print.  The Court explained that this infringement theory was not found anywhere in Plaintiff's Final Infringement Contentions.

"Since the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *see also Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1325-26 (Fed. Cir. 2004) ("Because [the patentee] bears the burden of establishing infringement at trial, in moving for summary judgment [the accused infringer] need only establish a deficiency concerning an element of [the patentee's] infringement claim.").  Here, without

the stricken portions of the Mitzenmacher Report, Plaintiff has identified no evidence from which a jury could find that the accused products satisfy the "input device" limitations of claim 1 of the '314 Patent and claim 2 of the '974 Patent or the "selectively associating" limitation of claim 51 of the '314 Patent.  Accordingly, Defendant has demonstrated that it is entitled to summary judgment of non-infringement on these claims.   *See Anticancer, Inc. v. Cambridge Rsch. & Instrumentation, Inc*., No. 07-CV-97 JLS RBB, 2009 WL 9115821, at *4 (S.D. Cal. Feb. 13, 2009) ("Summary judgment is appropriate against a party who bases its opposition on theories omitted from its infringement contentions.") (collecting cases).

Accordingly, the Court's assessment of the remainder of Defendant's Non-Infringement Motion is limited to: claim 1 of the '3005 Patent; claims 1 and 5 of the '582 Patent; claim 1 of the '415 Patent; and claim 1 of the '974 Patent.

### 1.   Infringement of Method Claims (Claims 1 and 5 of the '582 Patent and Claim 1 of the '974 Patent)

As Defendant notes, Plaintiff claims infringement of five method claims.  (*See* Dkt. 247-1 at 9).  Of those five method claims, three remain at issue: claims 1 and 5 of the '582 Patent and claim 1 of the of '974 Patent.  Defendant argues that Plaintiff cannot prove direct infringement of these method claims, because it cannot show that Defendant "performed each and every step of those methods."  (*Id*.).   Further, to the extent that Plaintiff claims joint infringement (also known as divided infringement), Defendant argues that Plaintiff (1) is precluded from raising those arguments due to its failure to include them

in its Final Infringement Contentions and (2) cannot prove in any event that all steps of the claimed method are performed or that Defendant is responsible for any alleged infringement by its customers. (*Id*. at 9-10).

"A method claim is directly infringed when someone practices every step of the patented method." *Ericsson, Inc.*, 773 F.3d at 1219. "Direct infringement under [35 U.S.C.] § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity. Where more than one actor is involved in practicing the steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015).[20] An entity is "responsible for others' performance of method steps in two sets of circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Id*. "[D]irecting or controlling others' performance includes circumstances in which an actor: (1) conditions participation in an activity or receipt of a benefit upon others' performance of one or more steps of a patented method, and (2) establishes the manner or timing of that performance." *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1365 (Fed. Cir. 2017) (quotations omitted).

---

[20]     A patentee may also pursue claims of indirect infringement. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004). However, Plaintiff has confirmed that, in light of Judge Payson's denial of its motion for leave to amend, "it is no longer pursuing indirect infringement[.]" (Dkt. 253 at 8).

The Court agrees with Defendant that Plaintiff has not come forward with evidence from which a jury could conclude that Defendant performed each of the steps recited in claims 1 and 5 of the '582 Patent. In particular, Plaintiff has not come forward with evidence that the accused products use a "gloss enhancing process," which is required by claims 1 and 5 of the '582 Patent.

Plaintiff offers multiple theories as to how the "gloss enhancing process" step has been met. First, Plaintiff contends that it has "presented through its expert, Dr. Kahn, [evidence] that a clear toner overcoat is a gloss enhancing process." (Dkt. 255 at 16). However, the Court has already determined that this portion of the Kahn Supplemental Report must be stricken, because it encompasses an infringement theory that was not included in Plaintiff's Final Infringement Contentions. It is axiomatic that the stricken portions of the Kahn Supplemental Report cannot be relied upon by Plaintiff to support its claim of infringement.

Second, Plaintiff argues that it has produced evidence "through its expert that external coaters provide a gloss enhancing process and that Xerox's iGen 5 Press works in conjunction with these external coaters." (Dkt. 255 at 16). As discussed in connection with Defendant's Motion to Strike, the only third-party coater identified in Plaintiff's Final Infringement Contentions as providing the required gloss enhancing process is the TEC Lighting Production UV Coater. And, as Defendant correctly points out, there is no

evidence in the record to support the conclusion that Xerox ever used or tested the TEC Lighting Production UV Coater in connection with the iGen 5 Press.[21]

Plaintiff argues that it has produced "circumstantial" evidence that Xerox used or tested the TEC Lighting Production UV Coater—namely, Dr. Kahn's deposition testimony that "it would be unreasonable for a company to make statements about printing products working together without actually testing the products together." (Dkt. 255 at 17). As another district judge recently explained in a similar case where Plaintiff claimed infringement of the '582 Patent, "Dr. Kahn's assumption that [the accused infringer] 'must have' used the [third-party] coaters together with the actual Pentachrome Accused Products or tested them to make sure they worked together is insufficient to overcome summary judgment because it is only an assumption, not evidence or even an opinion backed by evidence. Assuming that testing occurred, without any supporting evidence in the record, 'contradicts . . . well-established law that a patentee must prove infringement by a preponderance of the evidence.'" *Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*, No. 2:19-CV-00514-JDW, 2021 WL 3722329, at *6 (E.D. Pa. Aug. 23, 2021) (quoting *Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1370 (Fed. Cir. 2012)).[22] No reasonable juror could conclude, based solely on Dr. Kahn's assumption, that Defendant

---

[21]     The Court notes that the same is true of the other third-party coaters discussed by Dr. Kahn.

[22]     An appeal of this decision is pending before the Federal Circuit; oral argument is scheduled for November 3, 2022.

had actually used the TEC Lighting Production UV Coater to practice the gloss enhancing process step of the relevant claims of the '582 Patent.[23]

There is further no evidence in the record of Defendant's customers ever using the TEC Lighting Production UV Coater in this fashion. Plaintiff states generally that it "presented evidence that the iGen 5 Press works in conjunction with external coaters and that customers can purchase these coaters to use with their iGen 5 Press. Xerox's own website and documents state that these products work with the iGen 5 Press and that customers can purchase them." (Dkt. 255-2 at ¶ 331). However, Plaintiff cites to portions of the Kahn Supplemental Report that say nothing about any customer ever having purchased or used the TEC Lighting Production UV Coater. It is not sufficient, in opposition to Defendant's Non-Infringement Motion, for Plaintiff to argue that some customer somewhere must have used the TEC Lighting Production UV Coater at some point. *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222-23 (Fed. Cir. 2007) ("If, as E-Pass argues, it is 'unfathomable' no user in possession of one of the accused devices and its manual has practiced the accused method, . . . E-Pass should have had no

---

[23]    Moreover, even accepting Dr. Kahn's evidence-free assumption, he did not opine that this testing would have necessarily included performance of all the other steps of the asserted claims of the '582 Patent. This is insufficient to show infringement of a method claim. *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("[T]he evidence here shows, at best, that [] defendants taught their customers each step of the claimed method in isolation. Nowhere do the manual excerpts teach all of the steps of the claimed method together, much less in the required order.").

difficulty in meeting its burden of proof and in introducing testimony of even one such user.").

Because a reasonable jury could not find that all steps of the methods claimed in claims 1 and 5 of the '582 Patent have been performed by or are attributable to Defendant, Defendant is entitled to summary judgment of non-infringement.  The Court accordingly need not and does not reach the other arguments Defendant has made as to these claims.

The Court further agrees with Defendant that Plaintiff does not have sufficient evidence to show that Defendant directly infringed claim 1 of the '974 Patent.  The method set forth in claim 1 of the '974 Patent requires that a "plurality of documents" be transmitted into "an electronic folder in the computer" and then arranged in that same folder "in the order the documents are to be printed in the printed end document."  (Dkt. 247-20 at 22). However, as Defendant correctly points out, Dr. Mitzenmacher (Plaintiff's infringement expert as to the '974 Patent) does not opine that the plurality of documents are arranged in the required electronic folder.   Instead, Dr. Mitzenmacher opines that, within the accused products, the documents are placed into a "hot folder," which is the required electronic folder.  (Dkt. 280-4 at ¶¶ 212, 214, 216-17).  However, Dr. Mitzenmacher does not then indicate that the accused products arrange the documents within that same "hot folder." Instead, Dr. Mitzenmacher indicates that the accused products take the documents "from a hot folder" and then arrange them.  (*Id.* at ¶¶ 226, 233-34, 236-37).  Moreover, while Dr. Mitzenmacher identifies various other ways in which the accused products allegedly

"arrange[] documents in a folder in the order the documents are to be printed in the printed end document" (*id*. at ¶¶ 228-31, 35 (emphasis added)), he does not indicate that those folders are the same hot folder into which the documents were initially transmitted.  No reasonable jury could conclude from this opinion that the limitations of claim 1 of the '974 Patent are satisfied by the accused products.

Further, while Dr. Mitzenmacher has offered a doctrine of equivalents opinion as to this limitation of claim 1 of the '974 Patent (*id.* at ¶¶ 244-46), the Court has already determined that this infringement theory was not appropriately disclosed and must be stricken.  It accordingly cannot be relied upon by Plaintiff to show infringement of claim 1 of the '974 Patent.

### 2.    Infringement of System Claim (Claim 1 of the '415 Patent)

Defendant next argues that Plaintiff cannot show infringement of claim 1 of the '415 Patent, which claims a system.  "[A] systems claim is infringed by the sale of the system." *Omega Pats., LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345 (Fed. Cir. 2019).  Accordingly, the dispositive issue is "whether all of the elements of the claim are present in the accused systems allegedly sold by [Defendant]."  *Id*. (quotation and alterations omitted); *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) ("In order to 'make' the system under § 271(a), [Defendant] would need to combine all of the claim elements. . . .").

Claim 1 of the '415 Patent requires a "belt glosser." (*See* Dkt. 247-2 at ¶ 361; Dkt. 255-2 at ¶ 361). Plaintiff has offered two theories for how this requirement is satisfied: (1) the fuser in the iGen 5 Press; and (2) third-party coaters. (Dkt. 247-2 at ¶ 366; Dkt. 255-2 at ¶ 366). The Court has already held, in connection with Defendant's Motion to Strike, that Plaintiff did not timely disclose and therefore cannot pursue an infringement theory wherein the fuser is the required belt glosser. As to third-party coaters, as explained above, Plaintiff's Final Infringement Contentions identify a single third-party product as disclosing a belt glosser—the Duplo 145A/205A UV Offline Coater. (*See* Dkt. 221 at 835-36).

Defendant is correct that, on the record before the Court, no reasonable jury could find that Defendant ever made, used, imported, sold, or offered to sell a system in which a third-party coater was included. It is undisputed that the external coaters at issue are made by third parties. (Dkt. 247-2 at ¶ 330; Dkt. 255-02 at ¶ 330). Similarly to the '582 Patent, while Dr. Kahn speculates that Defendant must have tested the third-party coaters in connection with an iGen 5 printer, he has not based that speculation on any evidence in the record. Plaintiff also cannot show that Defendant ever sold an iGen5 printer as a system with a third-party coater. The only evidence Plaintiff cites in support of its contention that this is the case is paragraphs 415 through 427 of the Kahn Supplemental Report. (*See* Dkt. 255-2 at ¶ 383). However, the cited paragraphs of the Kahn Supplemental Support—many of which have been stricken by the Court for discussing third-party coaters not disclosed

in Plaintiff's Final Infringement Contentions—contain no evidence regarding sales or offers to sell a system.

Plaintiff's argument that "[t]he iGen 5 Press is capable of working in conjunction with the external coaters such that it can be found to infringe" even if Defendant does not itself sell or offer to sell the third-party coaters (Dkt. 255 at 18-19) is simply incorrect as a matter of law. "[O]ne may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n.2 (Fed. Cir. 2000); *see also Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1368 (Fed. Cir. 2021) ("Because Dropbox does not provide its customers with any hardware in conjunction with its accused software, Dropbox does not make, sell, or offer for sale the complete invention.").

*Finjan*, on which Plaintiff relies (*see* Dkt. 255 at 18-19), is not to the contrary. In *Finjan*, "software for performing the claimed functions existed in the products when sold." 626 F.3d at 1205 (emphasis added). Customers merely needed to purchase "keys" to unlock the functionality that already existed within the product—which was akin, the Federal Circuit explained, to the fact that "an automobile engine for propulsion exists in a car even when the car is turned off ." *Id*. Here, the functionality associated with the third-party coaters simply does not exist in the iGen 5 printers as they are sold by Defendant. Instead, a customer must purchase a separate product (not a key or the equivalent) in order to obtain said functionality, and Plaintiff has offered no evidence that Defendant sold such

products together with the iGen5 printers.  Under these circumstances, no reasonable jury could find that Defendant had made, sold, or offered for sale the complete invention described in claim 1 of the '415 Patent.  Again, because the Court finds that Defendant is entitled to summary judgment of non-infringement on this basis, it need not and does not reach Defendant's other arguments as to this claim.

### 3.   Infringement of the Apparatus Claim (Claim 1 of the '3005 Patent)

The Court turns finally to Defendant's contention that Plaintiff cannot prove infringement of claim 1 of the '3005 Patent.   Claim 1 of the '3005 Patent is an apparatus claim that requires "a skimmer . . . carried on a support defined at least in part by a rotating shaft" and "a first guide plate . . . supported at least in part by and mounted to be pivotable independent of the rotation of said [skimmer] rotating shaft."  (Dkt. 247-2 at ¶¶ 399-401; Dkt. 255-2 at ¶¶ 255-2 at 399-401).

Defendant contends that Plaintiff cannot show infringement of claim 1 of the '3005 Patent for several reasons, including that it is has impermissibly taken positions contrary to those it made in opposition to Defendant's IPR petition.  (*See* Dkt. 247-1 at 25).   In particular, Defendant explains that before the PTAB, Plaintiff took the position that "pivoting" could only occur about an axis that is "fixed in space relative to the main unit of the image forming device."  (*Id*. (citations omitted)).  The PTAB agreed with Plaintiff, concluding that "[m]ere rotation of [a] shaft . . . relative to [a guide member's] bearings . . . does not mean that the upper guide member . . . pivots about [that] shaft" and that the

language of the '3005 Patent did not "support conflating mere rotation relative to other structures with pivoting about that rotating shaft." (Dkt. 247-63 at 13). However, in arguing that Defendant has infringed claim 1 of the '3005 Patent, Plaintiff's expert Dr. Nelson has opined that "when you say something pivots it's just—it's a relative rotational motion" and that the pivoting limitation is satisfied because there is "relative rotational motion" between both rollers and the guide plate. (Dkt. 247-65 at 9-10). Dr. Nelson further accuses a structure wherein the skimmer shaft is not fixed in space relative to the main unit of the printer of satisfying the pivotable element of claim 1 of the '3005 Patent. (*See* Dkt. 280-2 at ¶ 111).

The Court agrees with Defendant that Plaintiff has disclaimed the theory it now espouses regarding pivoting. "[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). This doctrine applies to statements made during IPR proceedings. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1363 (Fed. Cir. 2017) ("[S]tatements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be . . . relied upon to support a finding of prosecution disclaimer.").

Plaintiff argues that its "IPR arguments regarding the 'pivotable' element of Claim 1 are consistent with its infringement allegations," because it "did not take the position that

'pivoting' can only occur about an axis that is 'fixed in space relative to the main unit of the image forming device.'"  (Dkt. 255 at 20-21 (citations omitted)).  However, Plaintiff's submission to the PTAB states otherwise, arguing that the upper guide member disclosed in Suzuki 882 could not possibly pivot around the shaft mapped to the skimmer, because it was the shaft mapped to the separator that was fixed in space relative to the main unit of the image forming device.  (Dkt. 247-62 at 18).  Although phrased as a negative, the only reasonable reading of this argument is that the pivoting required by claim 1 of the '3005 Patent must occur around the shaft that is fixed in space relative to the main unit of the image forming device.  The PTAB understood Plaintiff to be making that argument, and it agreed therewith.  (*See* Dkt. 247-63 at 13 ("[It] appears, as Patent Owner contends, that because [the alleged separator shaft] is fixed, [the] upper guide member . . cannot pivot about . . . the alleged skimmer shaft, as required by the claims.")).  Plaintiff cannot now abandon the position it successfully took before the PTAB in order to claim infringement by Defendant.  *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("Because the expert testimony [taking a position different from the prosecution history] is entitled to no weight, it cannot create a genuine issue of material fact precluding summary judgment.").

Without Dr. Nelson's impermissible testimony and opinion, Plaintiff cannot demonstrate that the accused products have a guide plate that is pivotable about the skimmer shaft.   Defendant is accordingly entitled to summary judgment of non-

- 100 -

infringement, and the Court need not reach the other arguments raised by Defendant regarding claim 1 of the '3005 Patent.

### B. **Plaintiff's Infringement Motion**

The Court considers lastly Plaintiff's Infringement Motion.  Plaintiff seeks summary judgment that the Xerox Phaser 6500 Series infringes claim 12 of the '255 Patent and that Xerox FreeFlow Core and FreeFlow Print infringe claim 1 of the '9005 Patent.  (*See* Dkt. 246-1 at 2-3).  However, the Court has, for the reasons discussed at length above, granted Defendant's Invalidity Motion as to these claims.   Accordingly, Plaintiff's Infringement Motion must be correspondingly denied.  *See Richdel,* 714 F.2d at 1580 ("The claim being invalid there is nothing to be infringed.").

Plaintiff's further seeks summary judgment that the Xerox iGen 5 Press infringes claims 1 and 5 of the '582 Patent and claim 1 of the '415 Patent.  (*See* Dkt. 246-1 at 2).  However, the Court has already determined, for the reasons discussed at length above, that Defendant is entitled to summary judgment of non-infringement as to these claims.  Plaintiff's Infringement Motion accordingly fails in its entirety.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's Motion to Strike (Dkt. 237), denies Plaintiff's Motion to Strike (Dkt. 238), denies Plaintiff's Validity Motion (Dkt. 242), grants in part and denies in part Defendant's

Invalidity Motion (Dkt. 243), denies Plaintiff's Infringement Motion (Dkt. 246), and grants in part and denies in part Defendant's Non-Infringement Motion (Dkt. 247).

As to the claims that remain at issue in this litigation, the Court finds that: (1) Defendant is entitled to summary judgment of invalidity as to claims 1 and 14 of the '285 Patent, claim 1 of the '9005 Patent, and claim 12 of the '255 Patent; and (2) Defendant is entitled to summary judgment of non-infringement as to claim 1 of the '3005 Patent, claims 1 and 51 of the '314 Patent, claims 1 and 2 of the '974 Patent, claims 1 and 5 of the '582 Patent, and claim 1 of the '415 Patent.  The Court having resolved the case in Defendant's favor on all remaining claims, the Clerk of Court is directed to enter judgment in Defendant's favor and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  September 28, 2022
          Rochester, New York